**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**William DOYLE, Defendant–Appellant.**

**No. 95–3367.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1997.

Decided Aug. 1, 1997.

Alex Menchaca (argued), Office of the United States Attorney, Criminal Division, Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Marianne Jackson (argued), Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, BAUER, and FLAUM, Circuit Judges.

BAUER, Circuit Judge.

William Doyle was named in Counts One, Two, and Three of a second superseding indictment which charged thirty-eight defendants with federal crimes in conjunction with their participation in the El Rukn organization, a Chicago street gang. Counts One and Two alleged conspiracy and substantive violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) & (d). Count Three charged Doyle with engaging in a narcotics conspiracy, in violation of 21 U.S.C. §§ 841 and 846. A jury found Doyle guilty on all three counts. After a hearing on their post-trial motions, the district court granted Doyle and two of his co-defendants' motion for a new trial based on allegations of prosecutorial misconduct. Doyle was again found guilty on all counts in his retrial. Doyle was sentenced to life imprisonment on Count Three and to two concurrent twenty-year sentences on each of Counts One and Two. Doyle appeals from his conviction. He raises two double jeopardy arguments concerning his retrial, and he argues that the district court abused its discretion in limiting the scope of opening statements during his second trial. We affirm.

**Background**

The original indictment in this case, returned by a federal grand jury on October 26, 1989, consisted of 305 pages. The indictment contained 175 counts and named 38 defendants, including Doyle, most of whom were allegedly members or associates of the El Rukn gang. It charged more than 250 factually separate criminal acts committed over a period of 23 years in many different locations. In *United States v. Andrews*, 754 F.Supp. 1161, *modified*, 754 F.Supp. 1197 (N.D.Ill.1990), Judge Marvin Aspen severed the case into five trials. This appeal concerns the portion of the severed indictment designated as "Trial Two," which was before Judge Suzanne Conlon. Five defendants were involved in Trial Two: Henry Andrews, George Carter, William Doyle (appellant here), J.L. Houston, and Derrick Porter. On April 3, 1991, the grand jury returned a second superseding indictment ("the indictment"), which resulted in the renumbering of some counts and some predicate acts. Doyle was charged in Counts One, Two, and Three of the indictment.

Count One, the RICO conspiracy charge, identified the El Rukn organization as the racketeering enterprise, named 37 defendants and 35 unindicted coconspirators, and alleged 174 overt acts in furtherance of the racketeering conspiracy. The indictment alleged that one of the purposes of the racketeering enterprise was to acquire power for the enterprise in the Chicago metropolitan area and in other cities throughout the United States through drug trafficking, murder, extortion, robbery, fraud, and the acquisition and intended use of weapons and explosives. Under the direction and control of Jeff Fort, the named defendants and other unindicted coconspirators allegedly conducted the affairs of the El Rukn organization through countless acts of racketeering, including murder, attempted murder, conspiracy to commit murder, kidnaping, wide-scale drug trafficking, obstruction of justice (including one attempt to bribe a judge), witness intimidation, retaliation and tampering. Count Two, the substantive RICO count, named thirty-three defendants and thirty-eight unindicted coconspirators in the enterprise. It charged Doyle and the other named defendants with conducting and participating in the conduct of the El Rukn organization's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Count Two alleged sixty-four acts of racketeering including mur-

der, attempted murder, intimidation, and other acts of violence. Count Two charged Doyle with participating in eleven predicate acts, including murder and attempted murder, in furtherance of the El Rukn organization. Count Three, the narcotics conspiracy count, charged thirty-seven defendants and named thirty-five unindicted coconspirators and alleged that they participated in a conspiracy to deal in narcotics from 1966 until 1991.

The El Rukn organization, like most complex street gangs, was hierarchically structured. The hierarchy consisted of "Generals," "Officers," "Ambassadors," and "Riders." Doyle was an "Officer" in the El Rukn organization from approximately 1980 to 1983. The Officers were responsible for enforcing the gang's rules and for fighting gang rivals, which they accomplished through murders, shootings, beatings and intimidations. From approximately 1983 to 1989, Doyle was a "General" in the El Rukn organization. Generals were primarily responsible for running the organization under the direction of Fort.

The first trial in this case occurred in July and August 1991. On August 29, 1991, Doyle was found guilty on all three counts.[1] On May 18, 1992, Doyle and two of his codefendants, Henry Andrews and George Carter, filed a joint motion to vacate their judgments of conviction and to dismiss based on double jeopardy, or, alternatively, for a new trial based on allegations of newly-discovered prosecutorial and witness misconduct.[2] These motions were based on alleged *Brady* and *Giglio* violations. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (imposing obligation on prosecutors to disclose material exculpatory information which is favorable to the defense); *see also Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (requiring prosecutors to provide the defense with evidence relating to the credibility of prosecution witnesses). After a lengthy hearing on the motion, Judge Conlon concluded that the evidence illustrated that the defense's allegations of misconduct had "some grounding in reality." *United States v. Andrews,* 824 F.Supp. 1273, 1291 (N.D.Ill.1993) (quoting *United States v. Bernal–Obeso,* 989 F.2d 331, 337 (9th Cir.1993)). She noted that *Giglio* required the prosecution to disclose all material information "casting a shadow on a government witness's credibility," *id.* (citing *Bernal–Obeso,* 989 F.2d at 333–34), and that the suppressed evidence "would have provided a fertile basis for defense counsel to probe bias and motives," *id.* She ruled that it was "reasonably probable that if effectively used, the suppressed evidence may have caused the jury to reject some or all of the testimony of the El Rukn inmate witnesses." *Id.* (citing *United States v. Wallach,* 935 F.2d 445, 454 (2d Cir.1991)). She therefore ordered that a new trial was required in the interest of justice. *Id.* Additionally, the de-

---

1. The jury found Doyle not guilty on one predicate racketeering act in Count Two—the murder of Willie Bibbs.

2. In her ruling on this motion, Judge Conlon summarized the allegations of misconduct:

 During the protracted hearing, remarkable credibility issues were raised when present and former employees of the United States Attorney's office and various cooperating government witnesses gave conflicting testimony. The hearing revealed that substantial evidence reflecting adversely on the reliability and biases of the El Rukn inmate witnesses was not disclosed to defense counsel before or during Trial Two [this severed portion of the indictment]: drug use while in custody as protected government witnesses; disciplinary actions and non-enforcement of disciplinary measures; failure to conduct routine drug testing after October 1989; permissive and lax security measures, giving El Rukn inmate witnesses access to internal prosecution memoranda, drugs, sex and unlimited free telephone calls; and various gifts, including cash, clothing, "walkman" radios, food, cigarettes and beer. Some of the evidence presented went beyond the fundamental issues raised by the defendants' post-trial motions.
 *United States v. Andrews,* 824 F.Supp. 1273, 1277 (N.D.Ill.1993).
 For opinions dealing with other portions of the severed indictment and describing the extent of favor currying between the government and the cooperating El Rukn witnesses, see *United States v. Burnside,* 824 F.Supp. 1215 (N.D.Ill.1993) (Holderman, District Judge), *United States v. Boyd,* 833 F.Supp. 1277 (N.D.Ill.1993) (Aspen, District Judge) and *United States v. Boyd,* 874 F.Supp. 179 (1994), *aff'd,* 55 F.3d 239 (7th Cir. 1995) and *United States v. Bates,* 843 F.Supp. 437 (N.D.Ill.1994) (Mills, District Judge), *vacated sub nom. United States v. Williams,* 81 F.3d 1434 (7th Cir.1996).

fendants' motion to dismiss on double jeopardy grounds was dismissed by Judge Conlon.

Doyle's second trial began on March 6, 1995.[3] Prior to trial, the government filed a motion in limine asking the district court to restrict the defense from making reference to allegations of prosecutorial misconduct during opening statements. The district court ruled orally on that motion in favor of restricting the opening statements. On March 22, 1995, the jury found Doyle guilty on all three counts. The jury also found Doyle guilty, by special verdict, of ten racketeering acts, including murder and attempted murder. On September 20, 1995, Judge Conlon sentenced Doyle to life imprisonment on Count Three and concurrent twenty-year sentences on each of Counts One and Two. Doyle filed his notice of appeal in this Court on September 28, 1996.

### Analysis

Doyle presents three arguments on appeal: (1) whether the Fifth Amendment's Double Jeopardy Clause bars retrial in the absence of a defense motion for mistrial where prosecutors engaged in misconduct in order to prevent an acquittal they believed at the time was likely to occur in the absence of such misconduct; (2) whether double jeopardy bars Doyle's trial for drug conspiracy when he had previously pleaded guilty to federal charges involving the "same" drug conspiracy and RICO organization; and (3) whether the district court abused its discretion in granting the government's motion in limine to bar Doyle from mentioning prosecutorial misconduct during opening statements. We conclude that none of these arguments provide a basis for affording Doyle relief.

A. *Double Jeopardy and Prosecutorial Misconduct*

■ We review the district court's double jeopardy ruling de novo. *United States v. Asher*, 96 F.3d 270, 273 (7th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 786, 136 L.Ed.2d 729 (1997). In his post-trial motion, Doyle argued, based on *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982) and dicta in *United States v. Wallach*,

979 F.2d 912, 916 (2d Cir.1992), *cert. denied*, 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993), that double jeopardy barred his retrial because the government's misconduct was deliberate and intentional and undertaken to prevent an acquittal the government believed at the time was likely to occur absent the misconduct. In rejecting the double jeopardy argument, Judge Conlon refused to apply the expansion of *Kennedy* proposed by the *Wallach* dicta. For the following reasons, we agree.

■ The Double Jeopardy Clause of the Fifth Amendment provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *Asher*, 96 F.3d at 273 (citation omitted); *United States v. Penny*, 60 F.3d 1257, 1261–62 (7th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996) (citations omitted).

■ In general, double jeopardy "does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." *Lockhart v. Nelson*, 488 U.S. 33, 38, 109 S.Ct. 285, 289, 102 L.Ed.2d 265 (1988) (citation omitted). There are a few exceptions to this rule. For example, if a conviction is reversed because the evidence is legally insufficient to convict, retrial is barred because, for double jeopardy purposes, this is equivalent to a judgment of acquittal. *See Lockhart*, 488 U.S. at 39, 109 S.Ct. at 290 (citing *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)).

■ One of the main and most-frequently cited rationales behind the protections in the Double Jeopardy Clause is that a defendant has the right to have his trial completed by

---

**3.** Andrews and Carter both pleaded guilty and were not re-tried.

the first jury empaneled to try him. *Kennedy*, 456 U.S. at 673, 102 S.Ct. at 2088. Flowing from that rationale is the rule that if a defendant requests a mistrial, he gives up his right to a verdict by the jury then empaneled, and double jeopardy does not bar his retrial. *United States v. Higgins*, 75 F.3d 332, 333 (7th Cir.1996) (citing *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)). However, in *Oregon v. Kennedy*, the Supreme Court created an exception to this rule when it held that the Double Jeopardy Clause *does* bar retrial in the limited situation where the government engages in prosecutorial misconduct which gives rise to a successful motion for mistrial, and such misconduct "was intended to provoke the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 679, 102 S.Ct. at 2091. The reason for this, according to *Kennedy*, is that such misconduct prejudices the defendant's interest in having his trial completed by the jury empaneled to try him. *Id.* at 673, 102 S.Ct. at 2088. We explained this in *United States v. Higgins*: If the prosecutor deliberately introduces error in order to provoke the defendant into moving for a mistrial and to "rescue" a trial going badly, "the Constitution treats matters as if the mistrial had been declared on the prosecutor's initiative." *Higgins*, 75 F.3d at 333 (citing *Kennedy*, 456 U.S. at 679, 102 S.Ct. at 2091; *United States v. Oseni*, 996 F.2d 186 (7th Cir.1993); *United States v. Jozwiak*, 954 F.2d 458 (7th Cir.1992)). If that is the case, double jeopardy will bar the defendant from being retried.

Although *Kennedy* involved a situation in which the defendant actually moved for a mistrial, Doyle argues on appeal that there is no logical or legal basis for concluding that *Kennedy*'s reach is limited to such situations. In support of his position, Doyle contends that we should adopt dicta from the Second Circuit's decision in *United States v. Wallach*, 979 F.2d 912 (2d Cir.1992), *cert. denied*, 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993). This dicta suggests that the Double Jeopardy Clause might protect a defendant against retrial if the prosecutorial misconduct was undertaken with the intent of preventing an acquittal the prosecutor reasonably believed, at that time, was likely absent such misconduct. *Id.* at 916. Doyle believes that *Wallach*'s proposed extension of *Kennedy* should be applied to his case because the prosecutorial misconduct was of such a nature that it could not have been discovered by the defense until after trial, and the misconduct was undertaken in an effort to avoid an inevitable verdict of acquittal.

In *Wallach*, the defendant was convicted of federal criminal charges. The Second Circuit reversed the convictions because it found that Wallach had been convicted based upon testimony that the government "should have known" was perjured. *See United States v. Wallach*, 935 F.2d 445, 457 (2d Cir.1991). On remand, the government dismissed some of the counts against Wallach, and Wallach thereafter moved to have the remaining counts dismissed on double jeopardy grounds. The district court denied the motion as "frivolous."

On appeal after remand, the Second Circuit analyzed possible extensions of *Kennedy*'s holding. The government argued that *Kennedy* should be limited to the context of a criminal trial that ends with a defendant's successful motion for a mistrial. Like Doyle, Wallach did not move for a mistrial, much less obtain one, because he did not know about the alleged misconduct until after trial. Wallach, on the other hand, argued for an extension of *Kennedy* that would eliminate the requirement of a mistrial, because he believed that the Supreme Court also intended *Kennedy* to bar a second prosecution when the prosecutor engages in serious misconduct with the intention of preventing an acquittal. *Wallach*, 979 F.2d at 915. The Second Circuit suggested that some extension of *Kennedy might* be warranted, and explained:

> Since *Kennedy* bars a retrial on jeopardy grounds where the prosecutor engages in misconduct for the purpose of goading the defendant into making a successful mistrial motion that denies the defendant the opportunity to win an acquittal, the Supreme Court might think that the Double Jeopardy Clause protects a defendant from retrial in some other circumstances where prosecutorial misconduct is undertaken

with the intention of denying the defendant an opportunity to win an acquittal.

*Id.* at 916. However, the *Wallach* court went on to suggest, in dicta, that a narrower extension than the one sought by Wallach might be appropriate. The *Wallach* court believed that in *Kennedy*, the Supreme Court was attempting to delineate the distinction between prosecutorial misconduct that merely results in a mistrial (which does not bar retrial), and misconduct that is *undertaken for the specific purpose of provoking a mistrial.* According to the *Wallach* court, *Kennedy* bars retrial only in the latter case. *Id.* The *Wallach* court stated:

> If any extension of *Kennedy* beyond the mistrial context is warranted, it would be a bar to retrial *only where the misconduct of the prosecutor is undertaken, not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct.* If jeopardy bars a retrial where a prosecutor commits an act of misconduct with the intention of provoking a mistrial motion by the defendant, there is a *plausible argument* that the same result should obtain where he does so with the intent to avoid an acquittal he then believes is likely. The prosecutor who acts with the intention of goading the defendant into making a mistrial motion presumably does so because he believes that completion of the trial will likely result in an acquittal. That aspect of the *Kennedy* rationale suggests precluding retrial where a prosecutor apprehends an acquittal and, instead of provoking a mistrial, avoids the acquittal by an act of deliberate misconduct. Indeed, if *Kennedy* is not extended to this limited degree, a prosecutor apprehending an acquittal encounters the jeopardy bar to retrial when he engages in misconduct of sufficient visibility to precipitate a mistrial motion, but not when he fends off the anticipated acquittal by misconduct of which the defendant is unaware until after the verdict. There is no justification for that distinction.

*Id.* (emphasis added). The court then went on to apply this limited extension to Wal-

lach's case, but found, nonetheless, that double jeopardy did not bar Wallach's retrial. *Id.* at 916–17.

As stated above, Judge Conlon granted the defendants' motion for a new trial, but denied their motion to dismiss based on double jeopardy. She found that there had been no showing that the prosecutorial misconduct "was intended to provoke the defendant(s) into moving for a mistrial." *Andrews,* 824 F.Supp. at 1291 (quoting *Kennedy,* 456 U.S. at 679, 102 S.Ct. at 2091). Judge Conlon also indicated that she did not subscribe to the Second Circuit's expansive reading of *Kennedy* in *Wallach.* She stated: "Not only is the subjective *Wallach II* standard problematic to apply, dismissal of these serious charges is not in the interest of justice. The public would be ill-served by such a drastic remedy for prosecutorial malfeasance." *Id.*

Doyle's argument goes like this—his retrial should be barred because the prosecutors engaged in misconduct in his first trial because they reasonably believed, at the time they engaged in the misconduct, that an acquittal was likely to occur in the absence of such misconduct. Doyle's counsel stated at oral argument: "The intentional suppression of favorable evidence and the knowing use of perjured testimony in this case was intended to prevent and did prevent an acquittal in the first trial because the prosecution thought that it was likely that if the truth had surfaced at that first trial, that they would lose." The government, on the other hand, argues that *Wallach* is not, nor should it be, the rule in this Circuit.

There are two fatal flaws in Doyle's argument. First, our case law impliedly suggests that this Circuit does *not* subscribe to a *Wallach*-type expansion of *Kennedy.* See *United States v. Oseni,* 996 F.2d 186, 187–88 (7th Cir.1993). Second, although today we do not decide whether we would adopt the *Wallach* exception under other circumstances, Doyle does not, nor can he, show how he could meet either the *Kennedy* or the *Wallach* exception to the traditional double jeopardy analysis, even if either case were to apply.

 *United States v. Oseni* provides the most authoritative discussion in this Circuit

on the *Kennedy* rule. *Oseni* clarified that if, after a criminal trial begins, the government decides that a case is going badly for it, it cannot dismiss the case and reprosecute the defendant. The government also cannot achieve indirectly what it cannot achieve directly—it cannot engage in trial misconduct *that is intended to* and does indeed precipitate a successful motion for a mistrial by the defendant. *Oseni,* 996 F.2d at 187–88 (emphasis added) (citing *Kennedy,* 456 U.S. at 676, 679, 102 S.Ct. at 2089–90, 2091); *see also United States v. Jozwiak,* 954 F.2d 458, 459–60 (7th Cir.), *cert. denied,* 503 U.S. 950, 112 S.Ct. 1512, 117 L.Ed.2d 649 (1992). In *Oseni,* we went on to discuss the complications of this specific intent requirement:

> The fact that the government blunders at trial and the blunder precipitates a successful motion for a mistrial does not bar a retrial. Yet the blunder will almost always be intentional—the product of a deliberate action, not of a mere slip of the tongue. A prosecutor who in closing argument comments improperly on the defendant's failure to have taken the stand, thus precipitating a mistrial or a reversal on appeal, is no doubt speaking deliberately, though his judgment may be fogged by the heat of combat. But unless *he is trying to abort the trial,* his misconduct will not bar a retrial. It doesn't even matter that he knows he is acting improperly, provided that his aim is to get a conviction. *The only relevant intent is intent to terminate the trial, not intent to prevail at this trial by impermissible means.*

*Oseni,* 996 F.2d at 188 (citations omitted) (emphasis added). This language, written after the Second Circuit's decision in *Wallach* but failing to cite *Wallach,* suggests that this Circuit does not expand *Kennedy* to analyze the prosecutor's "intent to prevail at this trial by impermissible means" (which can also be roughly translated as attempting to "prevent an acquittal which the prosecutor believed at the time was likely to occur in the absence of his misconduct"). Rather, in this Circuit, all that bars a retrial under *Kennedy* is the prosecution's intent to abort the trial. *Accord Jozwiak,* 954 F.2d at 460 ("*Kennedy* distinguishes intent to improve the chance that the trier of fact will return a favorable

decision from the forbidden intent to *avoid* a decision by the trier of fact.").

 Although at oral argument, Doyle's counsel suggested that this intent to abort can be found in the record, we are unable to find any such evidence. Moreover, Doyle has not specifically pointed to anything concrete which would establish that the alleged prosecutorial misconduct was somehow designed to goad Doyle or any of his codefendants into moving for a mistrial. And, of course, no motion for a mistrial was actually made or granted during the first trial. This is significant because "a defendant who did not move for a mistrial on the basis of intentional prosecutorial misconduct cannot invoke the double jeopardy clause to bar the state from retrying him after his conviction is reversed on that ground." *Beringer v. Sheahan,* 934 F.2d 110, 114 (7th Cir.), *cert. denied,* 502 U.S. 1006, 112 S.Ct. 641, 116 L.Ed.2d 658 (1991); *see also United States v. Head,* 697 F.2d 1200, 1206 (4th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983). In *Beringer,* we explained that "it is the right to appeal, not the double jeopardy clause, that protects defendants from trial errors.... The double jeopardy clause serves not to punish prosecutorial misconduct; it simply ensures that the defendant, not the government, gets to choose whether to go to verdict." *Beringer,* 934 F.2d at 113.

Doyle believes that it is highly significant that the alleged prosecutorial misconduct in this case was undertaken covertly; he could not have known about the misconduct in order to make the requisite motion for a mistrial. This is, of course, a sticking point. Since Doyle did not know at trial that the prosecution was engaging in any possible misconduct, any such misconduct could not possibly have been designed to goad him into moving for a mistrial, or intended to abort the trial, as we have required since *Oseni.* Rather, Doyle and his co-defendants proceeded through trial to a verdict. If the prosecution was underhandedly attempting to curry favor with certain cooperating El Rukn witnesses in order to obtain favorable and helpful testimony, the prosecution was not doing so in order to *abort* the trial.

Rather, if this misconduct did occur, it more likely was undertaken with the intent to *win* at trial—not to force a second go-around in a complicated, expensive, lengthy and resource-depleting trial. There are a number of other reasons for this type of alleged misconduct besides intent to abort the trial—the prosecution may have been attempting to cover up what might have been ground for disciplinary sanctions, or, more innocuously, the prosecutors simply may not have believed or known that their conduct was improper. More realistically, however, the alleged misconduct appears to have been undertaken in order to provide insurance for a prosecutorial victory—a victory, we add, that appeared imminent in the face of the evidence. There is no evidence to the contrary.

■ Even if *Wallach* were the law in this Circuit, Doyle is similarly unable to identify the sufficient prosecutorial intent to meet its requirements. He has been unable to point to evidence in the record tending to show that the prosecution's intent was to avoid an acquittal which it reasonably believed at the time was likely to occur absent misconduct. Doyle's belief that this was the prosecution's intent is, at best, mere conjecture and speculation. There is simply no record evidence that unearths the inner-thoughts of the prosecutors. Certainly, there is no record evidence that the prosecutors were intending to avoid acquittal through misconduct because they believed they were on the brink of defeat. Prosecutors act at all times during trial with the knowledge that if they do not perform in certain ways, acquittal may be a possibility. That, of course, is part of the adversarial nature of our criminal trial system. However, a general sort of fear of acquittal is not enough to satisfy *Wallach* (even if it were the law in this Circuit)— Doyle would have to show, and he cannot, that the prosecution *knew* an acquittal was likely and that misconduct would be the only way to stave it off. While the record and Judge Conlon's factual findings in *Andrews* do indicate that prosecutorial conduct in the original trial left much to be desired, it is clear that neither Doyle nor the record can convincingly show that the prosecution engaged in questionable conduct because it believed Doyle would be acquitted if it did not.

In conclusion, because no evidence shows that the prosecutorial misconduct was undertaken with the intent of goading the defendants into moving for a mistrial, or with intent to abort the trial, the *Kennedy* exception does not apply. Rather, the general double jeopardy rule described in *Lockhart v. Nelson*, 488 U.S. 33, 38, 109 S.Ct. 285, 289, 102 L.Ed.2d 265 (1988) permits Doyle's retrial. We expressly reserve the question of whether *Wallach* would apply in other circumstances. *See Jacob v. Clarke*, 52 F.3d 178, 182 (8th Cir.), *cert. denied*, — U.S. ——, 116 S.Ct. 323, 133 L.Ed.2d 224 (1995) (reserving the question on the *Wallach* dicta). Judge Conlon's denial of the defendants' motion to dismiss based on double jeopardy is therefore affirmed.

B. *Double Jeopardy Based on Doyle's Mississippi Conspiracy Conviction*

In March or April of 1983, Doyle, Jeff Fort, and Henry Lee Timothy traveled to Tupelo, Mississippi, and attempted to trade eight ounces of cocaine and $18,750 for 100 pounds of marijuana. Unfortunately for them, the other party to the transaction was an undercover law enforcement agent. In connection with that trip, Doyle pleaded guilty to the state court charge of Conspiracy to Possess with the Intent to Distribute Marijuana, and received an eight-year prison term plus a three-year special parole term. In the Northern District of Mississippi, Doyle pleaded guilty to Conspiracy with Intent to Distribute Cocaine, Possession with Intent to Distribute Cocaine, and Interstate Travel in Aid of Racketeering, for which he also received an eight-year prison term plus a three-year special parole term.

As mentioned above, double jeopardy protects against three types of abusive prosecutions: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense. *United States v. Penny*, 60 F.3d 1257, 1261–62 (7th Cir.1995), *cert. denied*, — U.S. ——, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996) (citations omitted). Doyle argues that the Dou-

ble Jeopardy Clause bars his prosecution for a conspiracy for which he has already pleaded guilty and been convicted. He conclusively contends that the charges stemming from the Mississippi incident "appear to be the same charges" he faced at his retrial. He argues that "the 1983 incident that resulted in [his] federal conviction clearly was part and parcel of the same drug conspiracy described in Count Three of the 1989 indictment." In support of his argument, Doyle points out that the same RICO enterprise, the El Rukns, was the subject of both convictions and the same undercover officer was involved in the Mississippi case and testified at Doyle's retrial. He also argues that because the RICO charges in Count One and Count Two incorporate the Count Three narcotics conspiracy by reference, double jeopardy bars his retrial on those counts as well. He asks us to vacate his conviction and sentence as to Count Three and to reassess his remaining convictions and sentences in light of the fact that they incorporate the allegations in Count Three by reference.

Doyle argues that evidence of the Mississippi conviction was admitted over objection at trial. However, Doyle did not cite to any objections in the record of the second trial that support his argument. The government also indicated in its brief that it was unaware of any objection in the record. Shortly before oral argument, the record in this case was supplemented with a document entitled "Motion to Dismiss Certain Allegations of Counts One, Two and Three on the Grounds of Double Jeopardy."[4] This motion was filed on March 16, 1990, during the first trial, when the entire indictment was before Judge Aspen and before the case was severed into five trials. The motion alleged that Doyle had "already been tried and convicted and/or pleaded guilty to a number of the charges which are realleged in various different Counts in this Indictment."[5]

On November 20, 1990, Magistrate Judge Rosemond entered a Recommendation that the district court deny Doyle's motion. The parties did not provide us with the record citation indicating that Judge Aspen adopted Magistrate Judge Rosemond's Recommendation. We take judicial notice of the district court's docket sheet in this cause, which notes that Judge Aspen adopted the Report and Recommendation on April 22, 1991. The docket entry notes that Doyle did not file any objections to the Report. We again remind both parties that we would have been greatly aided in our review of this matter if they had been more diligent and forthcoming in directing our attention to the correct citations from the record.

Doyle did not include this issue in his double jeopardy arguments in the posttrial motion filed with Judge Conlon, and it appears that he failed to raise this issue in the district court in the second trial. Therefore, we must initially determine whether Doyle waived or forfeited his right to object. *See Penny,* 60 F.3d at 1261.[6] In *United*

4. Neither party has supplemented the record, as far as we can tell, with a memorandum of law supporting this motion.

5. Specifically, Doyle argued in that motion that the predicate acts alleged in paragraph 44 of the Count One RICO conspiracy were the "same offenses" as the offense which was the subject of the 1983 guilty plea in Mississippi, within the meaning of the Double Jeopardy Clause. Doyle also argued that predicate Racketeering Acts numbers 32 and 33 in Count Two were the "same offenses" for purposes of the Double Jeopardy Clause as those to which Doyle pleaded guilty in Mississippi. Finally, Doyle argued that paragraphs 11–15 of Count Three alleged that Doyle conspired to commit certain narcotics offenses, which are the "same offenses" within the meaning of the Double Jeopardy Clause—namely, offenses stemming from the Tupelo incident.

In addition, Doyle was convicted in 1987 for the murder of Willie Bibbs, following a trial by jury in Cook County, Illinois. Doyle argued that both paragraph 33 in Count One and Racketeering Act number 10 in Count Two contained allegations that Doyle killed Willie Bibbs. Again, Doyle argued that the indictment charged him with the "same offenses" for which he had already been convicted, and that the Double Jeopardy Clause barred him from being retried for these offenses. Doyle has not re-raised this issue on appeal.

6. We direct Doyle's attention to our Circuit Rule 10(g), which concerns waiver, but which is similarly applicable here:

*Effect of Omissions from the Record on Appeal.* When a party's argument is countered by a contention of waiver for failure to raise the point in the trial court ..., the party opposing the waiver contention *must give the record cite* where the point was asserted and also ensure that the record before the court of appeals contains the relevant document or transcript.

*States v. Olano,* the Supreme Court explained the difference between waiving a right and forfeiting a right—waiver is the "intentional relinquishment or abandonment of a known right" and forfeiture is the "failure to make the timely assertion of a right." 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) (citations omitted). When a right is waived, it is not reviewable, even for plain error. *Penny,* 60 F.3d at 1261 (citing *Olano,* 507 U.S. at 733, 113 S.Ct. at 1777). In contrast, a right that is forfeited may be reviewed under the plain error standard set forth in Rule 52(b) of the Federal Rules of Criminal Procedure, which states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In *Penny,* we determined that a failure to assert the double jeopardy defense in the trial court constituted a forfeiture as opposed to a waiver. *Penny,* 60 F.3d at 1261. Because we are reviewing the second trial, and we are unable to find any renewal of the motion to dismiss based on double jeopardy stemming from the Mississippi conviction, we proceed from the assumption that Doyle failed to raise this issue in the second trial. We therefore review the forfeiture for plain error.

■ *Olano* set forth a three-part test for analyzing errors under Rule 52(b) to determine whether they constitute "plain errors" and therefore can be reviewed despite the absence of a timely objection. This test places three limitations on appellate authority: (1) there must be an error—a deviation from a legal rule that was not waived; (2) the error must be plain—clear or obvious under current law; and (3) the error must affect substantial rights—that is, it must have affected the outcome of the district court proceedings, and the defendant must be able to show such an effect on the outcome. *Olano,* 507 U.S. at 732–34, 113 S.Ct. at 1776–78. Rule 52(b) should be applied "sparingly" and saves only "particularly egregious errors" when "a miscarriage of justice would otherwise result." *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (citations omitted).

■ The Double Jeopardy Clause prohibits an individual from being prosecuted for two separate conspiracies if only one conspiracy exists. *United States v. Sertich,* 95 F.3d 520, 523 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 952, 136 L.Ed.2d 840 (1997); *United States v. Dortch,* 5 F.3d 1056, 1061 (7th Cir.1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994). It is often a difficult task to determine whether two prosecutions have occurred for purposes of double jeopardy. This task is even harder when we move from analyzing not just single-layered conduct, such as bank robberies, but multi-layered conduct, such as conspiracy, which expands over time and place. *See United States v. Thornton,* 972 F.2d 764, 765 (7th Cir.1992). This is so because it is hard to apply the double jeopardy concept of finality to crimes "which have no easily discernable boundaries with regard to time, place, persons, and objectives." *Id.*

■ When a defendant claims that a second prosecution subjects him to double jeopardy, he bears the burden of showing that both prosecutions were for the same offense. *Sertich,* 95 F.3d at 524 (citation omitted). The defendant first must set out a prima facie case that the second indictment charges him with the same offense for which he has already been convicted. Then, the burden switches to the government to demonstrate, by a preponderance of the evidence, that the two indictments charged separate offenses. *Id.* (citations omitted).

■ In most cases, to determine whether two indictments charge the same offense, we consider whether each offense contains an element not contained in the other. *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). However, in the conspiracy context, which is typically more involved, we must look at more varied factors than just whether the same elements are required or whether the same evidence must be admitted. In *United States v. Sertich,* we explained how we determine whether two charges arise out of the same conspiracy:

(emphasis added). We suggest that, in the future, both parties provide record citations for

issues involving waiver or forfeiture in the trial court.

[T]he court must look to such factors as whether [the two charges] involve the same overt acts, people, places, or time period; whether they share similar objectives or modus operandi; or whether the two conspiracies depend upon each other for success.

*Sertich*, 95 F.3d at 524 (citing *Dortch*, 5 F.3d at 1061; *United States v. Thornton*, 972 F.2d 764 (7th Cir.1992); *United States v. Chiattello*, 804 F.2d 415, 418 (7th Cir.1986); *United States v. Castro*, 629 F.2d 456, 461 (7th Cir. 1980)). Although the presence of several of these factors may prove that the two offenses are not separate, that is not always the case. Some of the factors may be, at times, more significant than others. As a result, we will not just tabulate similarities or dissimilarities between offenses, but, rather, we will look at the extent of the overlap between the offenses. *Id.* (citing *Dortch*, 5 F.3d at 1062). The test, therefore, is ultimately one of the totality of the circumstances. *Id.*

■ The Count Three narcotics conspiracy named thirty-seven defendants, including Doyle, and thirty-five unindicted coconspirators, alleged participation in the conspiracy over a time period of approximately twenty-five years, and specified numerous predicate acts committed in furtherance of the conspiracy. Count Three alleged that the narcotics conspiracy's objectives were possession and distribution of heroin and use of communication facilities in connection with the drug offenses. Count Three alleged, in relevant part:

It was part of the conspiracy that the defendants possessed with the intent to distribute and distributed multi-kilogram quantities of mixtures containing heroin and cocaine; hundreds of pounds of marijuana; thousands of amphetamine pills; thousands of Talwin and Triplenamine pills (hereinafter "T's and Blues"); multi-liter quantities of codeine syrup; and large quantities of Phencyclidine (hereinafter "PCP").

Unlike the 1983 conspiracy, the Count Three narcotics conspiracy did not merely pertain to narcotics-related activities in Tupelo, Mississippi, but, rather, to narcotics-related activities in various El Rukn-controlled areas and neighborhoods on the south side of Chicago and in Milwaukee, Wisconsin. Count Three alleged that the conspiracy utilized many different locations and El Rukn-controlled buildings in Chicago, Evanston, Skokie, Harvey, and Milwaukee, Wisconsin to sell narcotics. Count Three also alleged that firearms were used in connection with narcotics trafficking. Further, Count Three incorporated by reference paragraphs 1 through 10 of Count One, the RICO conspiracy charge. These paragraphs alleged numerous acts of violence and intimidation, including murder and kidnaping, in connection with maintaining and preserving the operation of the El Rukn organization. Racketeering acts alleged in Count One and Count Two also described numerous murders that involved the use of a firearm and that were committed in furtherance of the conspiracy. Doyle was named as a participant in eleven racketeering acts, many of which involved violence and murder, and he was convicted, by special verdict, of ten of these racketeering acts, including murder and attempted murder.

■ As the government's brief lays out, Count Three charged the conspiracy by dividing the narcotics-trafficking activities into approximately twelve distinct narcotics delivery systems, each involving a specified period of years, a particular drug or drugs, and a distinct group of people. Doyle was named as a participant in three of these delivery systems. First, Doyle was named in paragraph 4 of Count Three, which alleged that, between 1966 and 1977, Doyle, twenty-three co-defendants and five uncharged coconspirators possessed with intent to distribute marijuana, amphetamine pills, codeine syrup, T's and Blues, and PCP in El–Rukn–controlled neighborhoods on the south side of Chicago and in Milwaukee. Second, paragraph 7 of Count Three alleged that between 1976 and 1983, Doyle, four codefendants, and one uncharged coconspirator traveled to Detroit, Michigan to buy thousands of T's and Blues pills, and brought them back to Chicago for resale by other members of the conspiracy. Finally, paragraphs 14 and 15 of Count Three described the Tupelo, Mississippi incident, which occurred in March or April of

1983, when Doyle and two uncharged coconspirators attempted to trade approximately 200 grams of cocaine and $18,750 for 100 pounds of marijuana. In addition, of course, Doyle is not only criminally responsible for the alleged acts of the conspiracy in which he is specifically named in the indictment; *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) also makes him criminally liable for all the acts of his coconspirators undertaken in furtherance of the conspiracy and reasonably foreseeable to Doyle.

As to the 1983 Mississippi conspiracy conviction, we first point out that we do not have the benefit of reviewing all of the essential documents to determine the scope of that conspiracy and compare it to the Count Three narcotics conspiracy. Although the government did supplement the record with the 1983 indictment from the Northern District of Mississippi, the record does not contain the plea agreement, pre-sentence investigation report, or any other documentation regarding that conviction. Moreover, Doyle has failed to even cite the statutory provisions under which he was convicted in the Northern District of Mississippi.[7] There is obviously not enough information before us in order for us to engage in as complete an analytical comparison of the two charges as we would like.

However, based upon the information the record does supply, we can discern that the 1983 Mississippi conspiracy conviction was limited to the one discrete narcotics transaction described above. Count One of the 1983 Mississippi indictment, the conspiracy count, charged Doyle, Jeff Fort and Henry Lee Timothy with conspiring to possess and distribute 200 grams of cocaine from approximately November 1982 to April 5, 1983. The overt acts alleged as being in furtherance of that conspiracy were only acts connected with the single Tupelo trade. The other counts of the Mississippi indictment also charged Doyle with various federal crimes

only connected with the Tupelo trade. Unlike the El Rukn indictment at issue here, none of the counts in the Mississippi indictment alleged the use of firearms, violence, or wide-scale narcotics trafficking. Perhaps most significantly, the Mississippi indictment did not contain any counts explicitly relating the Tupelo trade to the El Rukn organization or suggesting that the Mississippi acts were committed in furtherance of the organization's objectives.

Incidentally, we need not address any contention that the Double Jeopardy Clause bars a federal prosecution for acts for which the defendant has already been prosecuted by a state. Such a contention has long been rejected by the United States Supreme Court. *See Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *see also United States v. Farmer,* 924 F.2d 647, 649–50 (7th Cir.1991); *Hutul v. United States,* 582 F.2d 1155, 1156 n. 2 (7th Cir. 1978), *cert. denied,* 440 U.S. 911, 99 S.Ct. 1222, 59 L.Ed.2d 459 (1979). We therefore need only concern ourselves with whether the Mississippi federal prosecution barred Doyle's prosecution under this indictment.

■ Similarly, we need not address any concern that Doyle's former conviction for any of the predicate offenses bars his conviction under RICO, because a RICO offense is not in any sense the "same" offense as the predicate offense. *United States v. O'Connor,* 953 F.2d 338, 344 (7th Cir.), *cert. denied,* 504 U.S. 924, 112 S.Ct. 1979, 118 L.Ed.2d 578 (1992) ("[I]n order to prevail on a RICO charge, the government must prove a sort of antisocial conduct entirely different, in both type and magnitude, from the underlying offenses.").

■ In sum, the totality of the circumstances does not support Doyle's argument that double jeopardy barred his prosecution. As the government's brief adeptly summarizes:

> ably in violation of 21 U.S.C. § 846), Possession with the Intent to Distribute Cocaine (presumably in violation of 21 U.S.C. § 841(a)(1)), and Interstate Travel in Aid of Racketeering (presumably in violation of 18 U.S.C. § 1952).

---

7. Magistrate Judge Rosemond also noted that Doyle had not identified the specific state or federal statutes under which he was convicted in Mississippi. Judge Rosemond surmised that in federal court, Doyle pleaded guilty to Conspiracy with the Intent to Distribute Cocaine (presum-

[T]he 1983 conspiracy involved the actions of only three people over a six month period of time. The 1991 conspiracy, while it included the acts charged in the 1983 conspiracy, involved the activities of 72 named participants over a 25 year period. Second, the 1983 conspiracy involved only one narcotics transaction, while the 1991 conspiracy involved hundreds. Third, the 1983 conspiracy did not involve the use of firearms, whereas in the 1991 conspiracy, the use of firearms to further the narcotics conspiracy was a major focus. Fourth, the two conspiracies differed substantially as to the time frame, number and type of criminal acts in which defendant personally participated. The 1983 indictment charged that defendant personally participated in one cocaine-for-marijuana transaction between November 1982 and April 1983. In addition to this transaction, the 1991 indictment charged that, between 1966 and 1983, defendant personally participated in numerous narcotics transactions involving Ts and Blues, marijuana, amphetamines, codeine syrup and PCP, and numerous acts of violence, including several murders. Fifth, the two conspiracies charged different statutory objectives.

Doyle is thus unable to meet his burden of showing that the two indictments charged him with the same conspiracy, and he cannot show that any error, much less plain error, tainted his conviction. We hold that, under the totality of the circumstances, the indictment in this case and the 1983 Mississippi federal indictment do not charge Doyle with the same conspiracy for purposes of the Double Jeopardy Clause. The Mississippi conspiracy is not, as Doyle contends, "part and parcel" of the Count Three narcotics conspiracy, and double jeopardy does not bar Doyle's retrial.[8]

### C. *Limitation on the Scope of Opening Statements*

 Finally, Doyle argues that Judge Conlon abused her discretion when she pro-

---

**8.** We hold, alternatively, that even if Doyle were able to show any error tainting the proceedings, he would be unable to meet the third prong of the *Olano* test—he cannot show that the error affected the outcome of the district court proceedings or any of Doyle's substantial rights. *See*

hibited mention, during opening statements in the second trial, of the complicity between the prosecution and the cooperating El Rukn witnesses. At the beginning of Doyle's retrial, the government filed a motion in limine to preclude evidence relating to government misconduct—specifically, the failures by the prosecution to disclose certain *Brady* or *Giglio* material. In its motion, the government recognized that evidence relating to the credibility of witnesses *vis a vis* the *Brady* or *Giglio* material was admissible. However, the government contended that evidence relating to the nondisclosure or late disclosure of the material did not bear on witness credibility and therefore was not a proper subject of cross-examination or of evidence. The government acknowledged that the defense would possibly call the lead prosecutor from the first trial to the stand, and asked the court to prohibit the defense from discussing prosecutorial misconduct or the lead prosecutor's possible testimony during opening statements. Judge Conlon entertained argument on this motion prior to the start of trial. Judge Conlon's comments regarding the motion included the following:

> THE COURT: I am just addressing opening statements right now, because I think a lot of it depends on what the witnesses say and who the witnesses are. (R. 18).

> \* \* \*

> THE COURT: Right now, Ms. Jackson, let's talk about opening statement and not the ultimate issues in the case. I know that to a certain extent your theory was the same, the original trial, the scope of evidence is, however, different. Now, I am trying to discern, for purposes of the government's motion in limine, whether or not it is appropriate-well, to what extent you wish to go into that issue and in what posture or frame of reference you would use. (R. 20)

> \* \* \*

*Olano*, 507 U.S. at 732–34, 113 S.Ct. at 1776–78. Even if all references to the 1983 Mississippi transaction were redacted from the indictment, we believe Doyle still would have been convicted on all three counts of the indictment.

THE COURT: Well, I am not making rulings on the scope of the defense at this posture or the scope of cross-examination, but I think Ms. Peter's point is well taken. You certainly may address, in your view, the lack of credibility or reliability in terms of the government's witnesses, but in terms of using opening statement to attack the former prosecution team in the case seems to me to be—

MS. JACKSON: Judge, we want to use the opening statement to tell the jury what our theory of defense is, that is the purpose of it.

THE COURT: Well, you certainly may do that. You certainly may do that. But the relevance of whether or not Mr. Hogan [the lead prosecutor] intended to act beyond the parameters of the law is not an issue before this jury.

MS. JACKSON: Judge, Mr. Hogan's conduct was all about inducing these witnesses to give testimony which was favorable to him without regard for its truth or falsity. That goes to bias, motive to testify falsely.

THE COURT: Well, you certainly can focus on what witnesses did and what information, whatever information or evidence you have if they did testify falsely and that they were improperly induced, but again, and I am so glad I put a half hour limit on these opening statements, but again, I do not see at this juncture it is appropriate to go into the legality or illegality of Mr. Hogan's conduct. I think that at this juncture is a collateral matter. Maybe the way the evidence comes in it will become relevant, I do not know. But I think at the present posture of the case it is not appropriate to go into the legality or illegality of Mr. Hogan's conduct.

MS. JACKSON: Judge, when you say go into the legality or illegality of Mr. Hogan's conduct, Judge, I cannot think of anything that is more relevant to our defense here than the fact that these people were allowed to use drugs, engage in sex, have unlimited telephone privileges, and a matter of other things, and nobody was told. That goes directly, Judge, directly to these witnesses' bias, interest, motive to testify falsely and it also, most respectful-

ly, Judge, I believe goes to their credibility. And what I am saying to the Court is, if that is your Honor's ruling, at least it is our feeling, Judge, that right up front this Court has cut a substantial part of our defense away. The prosecution—

THE COURT: Well, then, you have not listened very carefully to me, Ms. Jackson, because *I said I am not making evidentiary rulings. I am trying to determine the appropriate scope of opening statement, a one-half hour of opening statement.* And as I told the government during the pretrial conference, it is not appropriate to get *into all the ins and outs of a very complex* conspiracy case in opening statement. And I also do not intend to preclude you from legitimately attacking the credibility and reliability of government witnesses. And after having been through a long trial with me before in this case and in other cases, I am really surprised to hear you take that position. But, in any event, I do not think at this juncture that there is a sufficient showing of any relevance to whether or not Mr. Hogan's motives are material to this case, Mr. Hogan's motives and the propriety of Mr. Hogan's conduct as opposed to that of the witnesses, the government witnesses. You are certainly free to present to the jury your views as to the credibility or lack of credibility and unreliability of government witnesses during your opening statement. (R. 23–25) (emphasis added).

 Doyle argues on appeal that Judge Conlon's ruling prevented him from fully apprising the jury of his theory of defense and thereby denied him a fair trial. We review the district court's ruling on the government's motion in limine using an abuse of discretion standard, which means that we will reverse the ruling only when no reasonable person could agree with the district court. *Gagan v. American Cablevision, Inc.,* 77 F.3d 951, 966–67 (7th Cir.1996). We also reiterate that we leave the conduct of the trial and its direction to the sound discretion of the district court. The district court has wide discretion in the scheduling of a trial, and this discretion should not be disturbed absent manifest abuse. *United*

**1094**

States v. Murvine, 743 F.2d 511, 514 (7th Cir.1984) (citations omitted), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 962, 83 L.Ed.2d 967 (1985).

Based upon Judge Conlon's comments from the transcripts, we believe that the ruling in issue here pertains only to the scope of opening statement, and not more broadly to the entire trial. Doyle was certainly entitled to present a defense which was based on attacking the credibility of the cooperating El Rukn witnesses and illustrating their bias or motive to fabricate. Judge Conlon obviously knew that and conveyed that to defense counsel. However, the sole issue before us is whether Judge Conlon abused her discretion in limiting the scope of the opening statements, and we are certain that she did not.

In the context of a very lengthy and complex drug and RICO conspiracy case, Judge Conlon was well within the bounds of her discretion in requiring the parties to minimize their opening statements and refrain from raising the complicated problem of prosecutorial misconduct in these short statements. Judge Conlon merely asked the parties to keep the opening statements to the bare minimum of the substance of the charges against the defendant. The record establishes that Judge Conlon did not bar the defense from using the credibility of the cooperating El Rukn witnesses as a primary component of its defense. Rather, she allowed the defense to bring up the issue throughout its cross-examination of the prosecution's witnesses. In fact, as the government notes in its brief, Doyle has failed to cite even one instance from the record of the second trial in which the defense sought to introduce evidence of prosecutorial misconduct and Judge Conlon denied the request. This certainly evidences the defense's inability to demonstrate that Judge Conlon's ruling on the motion in limine had any detrimental or other effect on its case. Absent such an effect, we find it difficult to fathom that no reasonable person could have taken Judge Conlon's view. We therefore will not interfere with her discretion in limiting the scope of opening statements.

### Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED in all respects.