# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 09-2151, 09-2152 & 09-2153

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEBRA HILLS, KENTON TYLMAN,
and BRENT WINTERS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 06-CR-20023—**Michael M. Mihm**, *Judge.*

ARGUED MAY 18, 2010—DECIDED AUGUST 18, 2010

Before O'CONNOR,\* *Associate Justice*, and KANNE and
ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge.* Appellants sold and imple-
mented domestic and international trust packages, which

---

\* The Honorable Sandra Day O'Connor, Associate Justice
(Retired) of the United States Supreme Court, sitting by designa-
tion.

were used by their clients to conceal income from the Internal Revenue Service (IRS) and thereby avoid payment of taxes. A grand jury indicted each of the Appellants with conspiracy to impede the IRS, and also returned indictments charging Debra Hills and Brent Winters with filing false income tax returns. After a joint trial, a jury found Kenton Tylman and Hills guilty of conspiracy and Hills and Winters guilty of filing false tax returns. Appellants now appeal various aspects of their trial and sentencing. We affirm both Tylman's and Winters's convictions. We vacate Hills's convictions and remand for further proceedings.

## I. BACKGROUND

The investigation of Appellants first began when an unrelated organization, Aegis Corporation, caught the attention of the IRS. Sometime in the late 1990s, the IRS received a tip that Aegis was promoting a tax evasion scheme. This tip turned out to be accurate—Aegis was in the business of selling fraudulent trust packages. The Aegis scheme was designed so that customers appeared to sell their assets to several trusts when, in fact, customers never really ceded control of their assets. This scheme was effectuated by requiring customers to "purchase" fictitious consulting services when, in reality, the "payment" for the services was the means by which the customers initially transferred their assets into a trust. Then, in most instances, the customers' assets were diverted through a series of trusts, which were also referred to as common-law business organizations

("CBOs"), until those assets ultimately landed in the account of an international business company ("IBC") that claimed exemption from United States taxation requirements. The IBCs then reconveyed the assets to the customers under the guise of a gift or a loan, or through the customers' use of a debit card tied to the IBC account. These reconveyed assets were never reported on the income tax returns of the Aegis customers.

From 1996 through 2000, IRS Special Agent Michael Priess investigated Aegis. Acting under the pseudonym "Michael Jordan," Priess posed as a customer and attended a number of Aegis seminars that promoted the trust program. In the mid-1990s, Appellant Kenton Tylman was working as a salesman for Aegis. It was at one of these seminars in 1998 where Priess first met Tylman.

After having success selling the Aegis trusts, in 1999 Tylman started his own company, Worldwide Financial Services ("WFS"), for the purpose of promoting and selling Aegis trusts. Appellant Debra Hills was an employee of WFS and Tylman's girlfriend. Appellant Brent Winters was an attorney both at WFS and at a successor company to WFS, Worldwide Financial & Legal Association ("WFLA"). Winters made an unsuccessful bid for Congress in 1998.

In March of 1999, Priess, suspicious of WFS, arranged to meet with Tylman, Hills, and others so that he could receive WFS's assistance in managing Aegis trusts that Priess had "purchased" previously. At that meeting, Priess explained that he had "paid" $290,000 to an Aegis-

created business under the guise of management services. He told those present that he had underestimated his income by $60,000 and that he was hoping to "take care of" those additional funds, meaning that he wanted to avoid reporting them as taxable income. Tylman offered to manage Priess's Aegis trusts, and also offered tax-return-preparation services through an Aegis accountant, who, according to Tylman, would be able to "do some tax, play games and do some things . . . with [Priess's $60,000]." (Tr. 133-34.)

After a year of investigation, in late March 2000, IRS agents attempted to execute a search warrant at WFS's offices. Before they could execute the search, Tylman and Winters objected on the grounds that the list of items to be seized was missing from the warrant. Agents left to procure a new warrant and returned four hours later with a revised warrant in hand. This time, the warrant contained a list of items to be seized, but listed the incorrect location from which the items were to be seized. When agents realized that they had obtained the wrong attachment, they left yet again to procure a third warrant. That evening, agents finally returned with the correct warrant and executed the search, seizing numerous documents and computers.

Six years later, in April 2006, a grand jury indicted Tylman, Winters, and Hills with conspiracy to impede the authority of the IRS in violation of 18 U.S.C. § 371. Hills was also charged with an individual count of tax fraud based on a tax return she had filed with her then-husband in 2000. Winters too was charged with an indi-

vidual count of tax fraud for his 1998 return. These tax fraud counts were brought under 26 U.S.C. § 7206(1).

Trial did not commence for two years after the indictments were issued because of various continuances, some sought by Appellants and some sought by the government. In June 2008, after a five-week trial, a jury convicted Tylman and Hills of conspiracy, but acquitted Winters of the conspiracy count. The jury also convicted Hills and Winters of tax fraud.

On appeal, Appellants argue that the district court committed various errors, at trial and sentencing. All three Appellants claim that their statutory and constitutional rights to a speedy trial were violated. They also complain that the search of WFS's offices violated their Fourth Amendment rights.

Winters argues that his conviction for filing a false tax return was time-barred. He also argues that the prosecution committed misconduct by offering certain evidence against him, and that the district court abused its discretion by admitting that evidence. Winters finally argues that the district court imposed an improper sentence on him.

Hills argues that there was insufficient evidence to support her conviction. She also contends that the prosecution committed misconduct during its closing argument by referring to Hills's invocation of the Fifth Amendment. Finally, Hills complains that the district court abused its discretion in denying her motion to sever.

We take each of these contentions in turn.

## II. ANALYSIS

### A. *Statutory Right to a Speedy Trial*

Appellants argue that they were denied their statutory right to a speedy trial because numerous continuances delayed the trial far beyond the seventy-day period prescribed by the Speedy Trial Act ("STA"), 18 U.S.C. § 3161 *et seq.* We review a district court's legal interpretations of the STA *de novo*, and its discretionary decisions to exclude time for an abuse of discretion. *United States v. Hemmings*, 258 F.3d 587, 591, 593 (7th Cir. 2001). Unless the district court committed legal error, "exclusions of time cannot be reversed except when there is an abuse of discretion by the court *and* a showing of actual prejudice." *United States v. Broadnax*, 536 F.3d 695, 698 (7th Cir. 2008) (emphasis added) (internal quotation marks omitted).

The STA provides that a defendant must go to trial within seventy days of either the issuance of an indictment or a defendant's first appearance before a judicial officer, whichever is later. 18 U.S.C. § 3161(c)(1). If a defendant is not brought to trial within that seventy-day window, the indictment against the defendant must be dismissed upon the defendant's motion. § 3162(a)(2). Dismissal may be with or without prejudice. § 3162(a)(1).

To provide courts with the necessary flexibility to accommodate pretrial proceedings, however, the STA provides for certain periods of time to be excluded from the seventy-day clock. *See* § 3161(h)(1)-(8). In particular, the STA requires that certain periods of time

"shall be excluded . . . in computing the time within which the trial of such offense must commence." This includes "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to . . . delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion . . . ." § 3161(h)(1)(D). Time is automatically excluded under this provision; no showing of actual delay in trial is required. *United States v. Montoya*, 827 F.2d 143, 150-51 (7th Cir. 1987).

The STA also permits a district court to exclude time that results from "a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of an attorney for the Government," if the judge's decision to grant the continuance was based on "his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). The STA provides a non-exhaustive list of bases upon which an ends-of-justice continuance may be granted, § 3161(h)(7)(B), and for time to be excludable under this provision, the court must undertake a timely consideration of the reasons for the continuance, *United States v. Napadow*, 596 F.3d 398, 404-05 (7th Cir. 2010).

Appellants claim that the district court erred in excluding various days from the STA time-clock. First, they claim that the sixteen-day period beginning on May 16, 2006, and running through May 31, 2006, should not

have been excluded because the motion filed by Winters for a bill of particulars did not actually *cause* delay in this case. Although Appellants acknowledge our holding in *United States v. Montoya*, 827 F.2d 143, 151 (7th Cir. 1987), where we held that no showing of actual delay was required to exclude the time spent in resolving pretrial motions, they urge us instead to adopt the Sixth Circuit's recent decision in *United States v. Tinklenberg*, 579 F.3d 589, 598 (6th Cir. 2009). In *Tinklenberg*, the Sixth Circuit held that the plain language of the STA requires a showing that actual delay resulted from a pretrial motion for the time spent resolving that motion to be excludable. *Id.*

We decline Appellants' invitation to change our precedent. In *Montoya*, we determined that because § 3161's language was ambiguous, we needed to resort to an examination of the legislative history supporting § 3161's enactment to determine whether the filing of a pretrial motion automatically stops the speedy trial clock or whether a causal relationship is required for an exclusion. 827 F.2d at 151. We concluded that Congress intended certain classifications of delay to be excludable automatically, and that, as such, the government need not prove a causal relationship between the filing of a pretrial motion and the delay in bringing a defendant to trial. *Id.*

In *Tinklenberg*, the Sixth Circuit reached the opposite conclusion, finding that § 3161 was unambiguous on its face. The court reasoned that because the STA mandates that a delay must "result from" a pretrial motion, a causal relationship is required for time to be excludable. 579 F.3d at 598.

We disagree, as do most of our sister circuits. *See, e.g.,* *United States v. Green*, 508 F.3d 195, 200 (5th Cir. 2007); *United States v. Hood*, 469 F.3d 7, 10 (1st Cir. 2006); *United States v. Vo*, 413 F.3d 1010, 1015 & n.2 (9th Cir. 2005); *United States v. Vogl*, 374 F.3d 976, 985 (10th Cir. 2004); *United States v. Titlbach*, 339 F.3d 692, 698 (8th Cir. 2003); *United States v. Dorlouis*, 107 F.3d 248, 253-54 (4th Cir. 1997); *United States v. Arbelaez*, 7 F.3d 344, 347 (3d Cir. 1993); *United States v. Wilson*, 835 F.2d 1440, 1443 (D.C. Cir. 1987), *abrogated on other grounds by Bloate v. United States*, 130 S. Ct. 1345 (2010); *United States v. Stafford*, 697 F.2d 1368, 1371-72 (11th Cir. 1983). Because we affirm the viability of our holding in *Montoya*, we find that the district court's automatic exclusion of the sixteen days running from May 16 to May 31, 2006, was proper. As of May 31, 2006, none of the STA's seventy days were consumed.

Next, Appellants argue that time was improperly excluded when Tylman's counsel filed a motion for a continuance. It is asserted that because Tylman had a personal right to a speedy trial, his counsel could not override his decision to exercise that right. This argument is without merit.

On June 22, 2006, Tylman's then-appointed counsel, John Taylor, filed a motion to continue trial. The motion explained that Taylor needed more time to review the case and to discuss the matter with Tylman. He further stated that the ends of justice would best be served by allowing him more time to prepare because adequate preparation time would protect Tylman's rights under the Fifth and Sixth Amendments.

The district court held a hearing on the motion on July 14, 2006, at which time it granted the continuance and excluded the time from the date of resolution of that motion to the date of the new trial, November 27, 2006. It is the time used to resolve the motion to continue—June 22, 2006, through July 14, 2006—that Appellants argue was improperly excluded.

On August 12, 2006, Appellants filed a motion to dismiss, alleging a violation of the STA. On February 22, 2007, the district court held a hearing on that motion. At that hearing, Taylor testified that prior to his filing the continuance, Tylman had made it known to Taylor that he did not want to forego a speedy trial. Notwithstanding Tylman's position, however, Taylor thought it best to continue the trial. Taylor told the district court that he had explained to Tylman that seeking a continuance was within his discretion as an attorney, and that he believed it was in Tylman's best interests to have the trial continued. Taylor also explained that at the time he filed the motion, he had reviewed only 500 pages of the thousands of pages of discovery materials that the prosecution had made available.

At the conclusion of Taylor's testimony, the district court noted that in addition to Taylor's request for more time, at the hearing on the motion to continue, Hills's then-counsel, Jerold Barringer, had stated that none of the defendants were ready to proceed to trial. Based on this evidence, the district court concluded that the continuance had been justified, and therefore, the motion to dismiss had to be denied.

We agree. Certain rights are fundamental, and therefore personal, to a defendant. Such rights include the waiver of the right to a jury trial, the right to plead guilty, the right to testify on one's own behalf, or the right to take an appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Although Appellants assert that the waiver of a right to a speedy trial is among these rights, they are incorrect. The right to a speedy trial is certainly an important right, yet trial tactics have always been within counsel's province. As we explained in *United States v. Gearhart*, 576 F.3d 459, 463 n.3 (7th Cir. 2009), "there is no requirement that counsel obtain [the defendant's] consent prior to making purely tactical decisions such as the decision to seek a continuance."

Furthermore, the STA itself recognizes counsel's ability to seek a continuance. The STA states that a district court may exclude time resulting from a continuance granted "at the request of the defendant *or his counsel* . . . ." 18 U.S.C. § 3161(h)(7)(A) (emphasis added). Congress clearly recognized that counsel could seek a continuance and codified this understanding of trial strategy. We see no reason to upset this understanding of the law. Accordingly, we find that the district court properly excluded the time running from June 22, 2006, through July 14, 2006. At that point, only twenty-one days out of the seventy-day period had been consumed.

But Appellants argue that the statements accompanying the district court's exclusion of time at the July 14 hearing failed to satisfy the mandates of § 3161(h)(7)(A). Therefore, Appellants claim that the

time running from July 15, 2006 (the day after the hearing on the motion to continue) through July 30, 2006 (the last date during which no other motions were pending) was improperly excluded.

As mentioned, § 3161(h)(7)(A) requires a court excluding time on ends-of-justice grounds to articulate its findings on the record. *Napadow*, 596 F.3d at 404-05. A court need not do so contemporaneously with the exclusion, but it must do so by the time it rules on a defendant's motion to dismiss. *Id.* at 405. If a court fails to explain its reasons for excluding time, the time will be counted toward the STA's seventy-day period. *Id.* at 404.

The STA provides various factors a court may consider in deciding that an ends-of-justice exclusion is warranted. General congestion of a court's trial calendar is an invalid reason for an exclusion. *United States v. Aviles*, 623 F.2d 1192, 1195 (7th Cir. 1980). Reasons that are acceptable include whether the failure to grant a continuance would result in a miscarriage of justice, whether the case is so complex that adequate trial preparation is impossible under the STA's time limits, and whether the failure to continue would deny the defendant reasonable time to obtain counsel, or would deny counsel the time necessary for effective preparation. 18 U.S.C. § 3161(h)(7)(C).

At the hearing to resolve Taylor's (and by extension, Tylman's) motion for a continuance, Taylor put forth various reasons why the ends of justice would be served by granting the continuance, including the intricacies and voluminousness of the case and the seriousness of

Tylman's potential punishment. The court agreed with Taylor that the case was serious and that the evidence was complex. The court then questioned the other defense attorneys to ascertain their thoughts on the continuance. Both Hills's counsel, Barringer, and Winters, acting pro se, agreed that although they could proceed without the continuance, they would prefer not to do so.

In granting the continuance, the district court stated that the complexity of the case supported its conclusion that a continuance was necessary. The court noted that effective preparation of counsel was a factor it could consider, and that without a continuance, it was surely opening the door to a later ineffective assistance of counsel claim. The district court also determined that because the defendants were not in custody, they would not be significantly prejudiced by a delay. In setting the new trial date, the court also commented that its time and schedule were valuable and that no more continuances should be granted.

We find that the district court's ends-of-justice finding was sufficient. The court articulated adequate reasons for its decision to grant the continuance, including the complexity of the case and the necessity to allow counsel adequate preparation. These were proper reasons for granting the continuance, and they suffice to meet the requirements of § 3161.

And despite the fact that the court mentioned the defendants' status as unincarcerated pre-trial defendants, it is clear that the principal reason for the court's decision to grant the continuance was to allow each defendant

and his or her counsel adequate time to prepare for trial in the face of the voluminous and intensive discovery record. Its questioning of counsel on this very point lends credence to that determination. Because the court's primary concern was adequate trial preparation, we save for another day the question of whether a trial court may give preference to cases in which the defendant is in custody at the expense of those cases in which the defendant is out on bail.

We also note that although the court commented on its time and schedule, this comment was not the basis for its ends-of-justice finding. Instead, the court's statement that its time and schedule were valuable was intended to serve as a warning to the parties that the court was disinclined to grant any more continuances. The best way to avoid these types of challenges is to clearly separate ends-of-justice findings from cautionary statements regarding new trial dates; however, because its time-management statement was not a reason for the district court's ends-of-justice finding, the court's ends-of-justice finding was not improper.

As the court's July 14 ends-of-justice finding was sufficient, the time between the granting of that motion and the filing of subsequent motions was properly excluded. At that point in the case, only twenty-one days had elapsed from the STA time-clock. Because trial began within the seventy-day period, Appellants' STA argument fails. We now turn to Appellants' constitutional speedy trial arguments.

### B. Constitutional Right to a Speedy Trial

Appellants also argue that they were deprived of their constitutional rights to a speedy trial under the Sixth Amendment. We review a district court's legal conclusions regarding Sixth Amendment speedy trial claims *de novo*, and its factual findings for clear error. *United States v. Arceo*, 535 F.3d 679, 684 (7th Cir. 2008).

The constitutional right to a speedy trial is triggered when an indictment is returned against a defendant. *Id.* A Sixth Amendment claim of a speedy trial violation is analyzed by considering "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651 (1992). The length of the delay, however, "is not so much a factor . . . as it is a threshold requirement: without a delay that is presumptively prejudicial, we need not examine other factors." *United States v. Loera*, 565 F.3d 406, 412 (7th Cir. 2009) (internal quotation marks omitted), *cert. denied*, 130 S. Ct. 654 (2009). We have determined that "delays approaching one year [are] presumptively prejudicial." *United States v. White*, 443 F.3d 582, 589-90 (7th Cir. 2006).

In this case, Appellants did not stand trial until two years after their indictments were handed down. Because two years creates a presumption of prejudice, we must now consider the other three *Doggett* factors to determine whether that prejudice amounted to a constitutional violation.

*1.  Blame for the Delay*

When analyzing which party is more to blame for the delay, the reason for the delay is generally the focal inquiry. *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). Because "pretrial delay is often both inevitable and wholly justifiable," *Doggett*, 505 U.S. at 656, "[d]ifferent weights should be given to different reasons for delay . . . ." *Arceo*, 535 F.3d at 684. "Delays due to the complexity of the case and the large number of defendants support a finding that no Sixth Amendment violation occurred." *United States v. Bass*, 460 F.3d 830, 836 (6th Cir. 2006). And while delays resulting from defense counsel's need to prepare are attributable to the defendant, *see United States v. Brown*, 498 F.3d 523, 531 (6th Cir. 2007), delays resulting from a trial court's schedule are ultimately attributed to the government, but weighted less heavily, *Barker v. Wingo*, 407 U.S. 514, 531 (1972).

Turning now to Appellants' claim, we must analyze each set of delays with those principles in mind. First, the court granted a nearly four-month continuance from July 14, 2006, through November 27, 2006, at the request of Tylman's counsel, Taylor. Hills's then-counsel, Barringer, also impliedly agreed with the basis of the motion—that none of the defense counsel were currently ready for trial. And Winters, proceeding pro se, concurred with Barringer's comments. Because this continuance was granted to allow trial counsel more time to prepare, this delay was attributable to Appellants and cuts against their Sixth Amendment argument.

Second, the court held a hearing on August 7, 2006, in which it disqualified Barringer as Hills's counsel due to

a violation of the Illinois Rules of Professional Conduct. On August 23, 2006, the court held a hearing with Hills to assess her efforts in finding replacement counsel.

Prior to that second hearing, however, the government sent a letter to presiding Judge Michael McCuskey, reminding him that he needed to recuse himself because of a prior recommendation he made to the United States Attorney's Office that the office investigate Winters for possible criminal conduct. Judge McCuskey formally recused himself at the August 23 hearing.

Two weeks later, on September 6, 2006, Judge Michael Mihm, who had been assigned to the case, held a telephone status conference with the parties. At that conference, Judge Mihm noted that Winters had filed an interlocutory appeal, alleging STA violations, Hills still did not have an attorney, and Taylor had moved to withdraw as Tylman's counsel. Judge Mihm decided that it would be premature to schedule a new trial date when two of the three defendants were unrepresented, so he scheduled a hearing for September 26, 2006, to address scheduling and other pending matters.

At the September 26 hearing, both Hills and Tylman requested to represent themselves at trial, and the district court agreed. The court then addressed the issue of the trial date. Judge Mihm commented that based on his experience in conducting tax fraud cases, he was concerned that the voluminous nature of discovery and complexity of the legal issues would require a trial date at least six months out—sometime in April 2007. Tylman responded that he foresaw at least nine months of work,

based on the amount of discovery. Tylman then re-
quested a trial date no earlier than the end of May, to
which Judge Mihm responded by inquiring whether
late June was desirable. Tylman agreed, as did Hills, and
the district court then scheduled trial for June 25, 2007.

While this delay of approximately ten months is some-
what attributable to the government, Appellants share
most of the responsibility. Judge McCuskey's recusal was
attributable to the government, despite its contention
otherwise, because a judicial recusal is more akin to a
trial court's scheduling problem than a defendant's
request for more time. Reasoning by analogy from
*Barker*, 407 U.S. at 531, we think the government can be
properly assessed with this initial delay.

But because the delay was prolonged by Appellants'
difficulties in securing replacement counsel, this delay is
not entirely attributable to the government. Two weeks
after Judge McCuskey recused himself, Judge Mihm was
assigned to the case. At that time, two defendants were
unrepresented and Winters had filed an interlocutory
appeal. The twenty days that it took for the court to
resolve these issues are, therefore, attributable to Appel-
lants.

The time between September 26, 2006, and June 25, 2007,
is also attributable to Appellants. It was Appellants who
requested to represent themselves. It was Appellants who
needed additional time to sort through the discovery
materials in preparation for trial. It was Appellants who
sought the nine-month continuance of the trial date in
furtherance of that preparation. These nine months
were therefore attributable to Appellants. As such, we

think that most of this ten-month delay can be traced to Appellants rather than the government.

Third, there was a delay occurring in April 2007. At that time, Appellants sought a continuance, claiming that the government was not making available all the discovery materials to which Appellants were entitled. On April 25, 2007, the district court held a hearing on the motion. The court concluded that the government was not withholding information, contrary to Appellants' assertions. This delay was not attributable to the government. It was Appellants' mistaken belief that the government was withholding information, so Appellants should bear the blame for that delay.

Finally, there were two delays occurring in April 2007 and again in September 2007, when Appellants sought more time to review the massive amounts of documents produced during discovery. In fact, the government unsuccessfully objected to the September 2007 motion. Because these continuances were both granted to allow Appellants more trial preparation time, they are attributable to Appellants.

We conclude that most of the delay in proceeding to trial was attributable to Appellants. We now turn to the second *Doggett* factor.

### 2. Assertion of Speedy Trial Rights

It is evident from Appellants' various motions and arguments that they asserted their rights to a speedy

trial. We therefore turn to whether they suffered prejudice from the trial's delay.

### 3. Prejudice Resulting from the Delay

We examine prejudice resulting from a delay in trial in light of the interests that the Sixth Amendment seeks to protect. The Sixth Amendment right to a speedy trial is animated by the need "(1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that defense will be impaired." *White*, 443 F.3d at 591 (internal quotation marks omitted). But "[w]hen a defendant is unable to articulate the harm caused by delay, the reason for the delay . . . will be used to determine whether the defendant was presumptively prejudiced." *United States v. Mundt*, 29 F.3d 233, 236 (6th Cir. 1994). In fact, as long as the government shows reasonable diligence in prosecuting its case, a defendant who cannot demonstrate prejudice with specificity will not show a Sixth Amendment violation, no matter how long the delay. *United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000); *see also Doggett*, 505 U.S. at 656.

With regard to this case, we first note that none of the Appellants was subject to pretrial incarceration. That factor cuts against them. Next, Hills claims that she suffered "great anxiety and concern over this case." But she has offered no evidence of her anxiety besides her general assertion that she was so afflicted, so we need not give this claim much weight. *See, e.g., United States v.*

*Frye*, 489 F.3d 201, 213 (5th Cir. 2007) (finding that an incarcerated defendant's uncorroborated claim of anxiety was insufficient to establish prejudice); *United States v. Henson*, 945 F.2d 430, 438 (1st Cir. 1991) (considering only "undue pressures" and not the anxiety that normally accompanies criminal procedures); *Morris v. Wyrick*, 516 F.2d 1387, 1391 (8th Cir. 1975) (same). Finally, Appellants claim that their defense was impaired because some of their witnesses no longer recalled vividly the events surrounding Appellants' illegal activities. We note, however, that because the delays in this case were primarily attributable to Appellants, they must demonstrate specifically how their defenses were prejudiced. *Howard*, 218 F.3d at 564; *see also Doggett*, 505 U.S. at 656. Appellants have not made this specific showing.

Only two of the witnesses Appellants point to testified that the passage of time affected their memories. And one of those witnesses testified that if provided information to help him connect a particular date to a given meeting, he would be able to answer defense counsel's questions. Appellants do not, however, point to any testimony by either of these two witnesses in which the witness could not recall an answer to a particular question.

Two more witnesses to whom Appellants refer did not testify that their memories were less potent because of the passage of time. In fact, one witness explained that he had trouble remembering events due to injuries sustained in an airplane crash decades earlier. The other testified that his stroke two years prior to trial had affected his ability to speak, but he did not testify as to the stroke's effect on his memory.

Finally, Appellants point to two witnesses who were no longer available at trial, but who Appellants claim could have assisted their defense. Appellants do not state that these witnesses *would* have helped their defense, but rather, only that this testimony *might* have helped their defense. They do not point to any specific testimony these witnesses would have offered; they only identify speculative testimony entirely unsupported by evidence. Because Appellants can point to no specific testimony that any of these six witnesses would have offered but were unable to offer by the time of trial, Appellants have failed to prove with specificity that they suffered prejudice to their defense.

As Appellants were responsible for most of the delay in their trial date, and as they failed to show that they suffered any prejudice, they have also failed to show a constitutional speedy trial violation.

## C.  Fourth Amendment Suppression

Appellants also contend that the district court erred in denying their motions to suppress evidence obtained pursuant to the search warrant executed at WFS. In reviewing a denial of a motion to suppress, we examine factual findings for clear error and legal questions *de novo*. *United States v. Burnside*, 588 F.3d 511, 516-17 (7th Cir. 2009).

The Fourth Amendment mandates that a warrant describe with particularity "the place to be searched and the persons or things to be seized." U.S. Const. amend. IV.

Case law has clarified that "[t]he level of specificity must be such . . . that the officers executing the warrant are able to identify the things to be seized with reasonable certainty." *United States v. Sleet,* 54 F.3d 303, 307 n.1 (7th Cir. 1995) (internal quotation marks omitted). Supporting affidavits may supply the particularity required, as long as those affidavits are incorporated into the warrant. *United States v. Jones*, 54 F.3d 1285, 1290 (7th Cir. 1995). If evidence is obtained in violation of the Fourth Amendment, that evidence may be excluded, *see, e.g., Arizona v. Evans*, 514 U.S. 1, 11 (1995), but it need not be, especially if evidence is obtained by officers acting in good faith on their belief that the warrant and their execution of it were valid. *United States v. Leon*, 468 U.S. 897, 919-21 (1984).

On March 31, 2000, IRS agents executed a search warrant at WFS's offices. As mentioned earlier, after their first attempt at execution, the officers had to return twice because of deficiencies in the first two warrants. The third warrant on which the officers acted identified the property to be seized as "[v]arious records and documents showing Tylman's participation in a fraudulent Trust Scheme, designed to evade Federal Income Taxes for the years 1994, 1995, 1996, 1997, 1998, and 1999." (Gov't App. at 69.) The warrant also contained an attachment, which specified twenty-five particular types of items to be seized. Appended to the warrant application was a lengthy affidavit in which IRS Agent Bernard Coleman detailed the alleged criminal activity occurring at WFS and recited the evidence that supported the conclusion that Aegis-related records were located on

WFS's premises. Attached to the affidavit was the list of items to be seized, which was identical to the list contained in the attachment. The items seized included five computers and numerous floppy discs. Because of time constraints, the agents removed the computers from WFS, copied the hard drives over the weekend, and returned the computers that Monday.

Appellants filed motions to suppress the evidence in the district court. After a three-day hearing on the issue, the court concluded that the list was sufficiently particular, finding that because this was a complex financial investigation, the warrant had to be broad enough to reflect the circumstances of the investigation. The district court determined that the affidavit supporting the warrant supplied the probable cause necessary, and that the evidence was therefore constitutionally obtained.

Appellants claim on appeal that the warrant authorized the seizure of *all* files and electronic media, but this is incorrect. The warrant actually specified the seizure only of those electronic devices "capable of storing any of the records described above," which referred to items related to conspiracy; tax, mail, and wire fraud; and money laundering. (Gov't App. at 71-76.) The warrant was therefore not as broad as Appellants contend. Furthermore, considering the warrant in light of the accompanying affidavit and attachment, it is evident that there were limits on what could be seized from the electronic media. In fact, the warrant specified the seizure of electronic business records and documents only, thereby precluding the seizure of electronic personal files. Finally,

Appellants have not identified any particular evidence seized that was not authorized by the warrant. On these bases, we conclude that the warrant was sufficient and that the evidence obtained pursuant to that warrant was properly admitted.

Appellants make one final argument for exclusion, alleging that the warrant was deficient because it did not specify the manner in which agents were to search the electronic media. But the Supreme Court has held that generally, the authority to determine how a warrant should be executed is best left to the officers performing the seizure. *Dalia v. United States*, 441 U.S. 238, 257-58 (1979). That rule is applicable here, and we see no reason to disturb that rule.

### D.  Statute of Limitations

Winters argues that his conviction for filing a false tax return is time-barred by the statute of limitations. We review the claimed violation of a statute of limitations *de novo* but give deference to the district court's factual findings. *United States v. McGowan*, 590 F.3d 446, 456 (7th Cir. 2009).

The offense of filing a false tax return requires the government to prove that (1) the defendant made or caused to be made a federal income tax return that he verified as true; (2) the return was false with regard to a material matter; (3) the defendant signed the return willfully, knowing that it was false; and (4) the return contained a written declaration that it was made under

penalty of perjury. *United States v. Oggoian*, 678 F.2d 671, 673 (7th Cir. 1982). A charge of filing a false tax return is timely if the indictment charging the offense is re-turned within six years of the day on which the offense is complete. *United States v. Solomon*, 688 F.2d 1171, 1179 (7th Cir. 1982).

The date on which an offense is complete, and thus, the date on which the statute of limitations begins to run, depends on whether the return is timely filed. If a return is timely filed, the statute of limitations begins to run on the due date of the return. *Hotel Equities Corp. v. Comm'r*, 546 F.2d 725, 727 n.3 (7th Cir. 1976). For returns that are untimely, the operative date is the filing date, or the date on which the IRS receives the return. In such a case, the statute of limitations begins to run on the date that the IRS received the return. *Emmons v. Comm's*, 898 F.2d 50, 51 (5th Cir. 1990).

Winters's 1998 return was late; it was not signed until April 3, 2000. Winters testified that he mailed it on the same day that he signed the return, but the IRS stamped the return with a postmark date of April 6, 2000, and a received-on date of April 8, 2000. Because his return was untimely filed, the statute of limitations did not begin to run until the IRS received the return—April 8, 2000. Because Winters's indictment was issued within six years of the date the statute of limitations began to run—April 6, 2006—Winters's conviction was not time-barred.

*E. Prosecutorial Misconduct*

Winters also alleges that the prosecution committed misconduct by offering evidence of his other returns, and that the district court erred in admitting this evidence. We review the admission of evidence for abuse of discretion. *United States v. Jumper*, 497 F.3d 699, 703 (7th Cir. 2007). If a claim of prosecutorial misconduct is made at the district court level, we review the district court's refusal to enter a judgment as a matter of law for an abuse of discretion. *See United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003). If the defendant does not raise the claim of prosecutorial misconduct until appeal, however, it is reviewed only for plain error. *Id.*

Winters's first claim of misconduct is that the prosecutor repeatedly asked leading questions and later acknowledged that she had no evidence to support the questions that she asked. He points to no record citations and provides us with no specific examples, however, so this claim is waived. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam).

Winters next argues that the prosecutor committed misconduct by offering, and the district court erred by admitting, his tax returns for 1999 and subsequent years. Under 26 U.S.C. § 7206(1), the statute that Winters was charged with violating, the false entry must be material. "[A] false statement is material when it has the potential [to] hinder[] the IRS's efforts to monitor and verify the tax liability" of the taxpayer, or when it results in the underpayment of tax. *United States v. Presbitero*,

569 F.3d 691, 700-01 (7th Cir. 2009) (internal quotation marks omitted) (alteration in original).

The prosecutor offered and the district court admitted Winters's post-1998 tax returns to establish this materiality element. As an IRS agent testified at trial, the $3000 false loss carried over from Winters's 1998 return resulted in an understated tax liability on his 1999 return. Therefore, the evidence of Winters's subsequent tax returns was necessary to establish that Winters's false statement was material. It was neither prosecutorial misconduct nor an abuse of discretion to admit this evidence.

Winters also objects to the introduction of an unsigned income tax return for 1998 that showed only income items and did not include the deductions Winters included on his signed return. The government argued that this unsigned return was necessary to show Winters's willfulness in the filing of the false return, which is also a required element under § 7206(1). The government claims that Winters used this unsigned return to obtain a residential loan from a bank. Because this unsigned return included a high income and no deductions, so goes the argument, this demonstrated that Winters's inclusion of income was done for the express purpose of gaining whatever benefit suited him at the time. In contrast, his signed IRS return claimed numerous deductions so that he could avoid substantial income tax payments. As with the evidence of the subsequent returns, we see neither misconduct nor abuse of discretion in the admission of this evidence. The jury surely could have concluded that this unsigned return

helped establish willfulness, and we see no error in its admission.

Finally, Winters claims for the first time that the prosecutor committed misconduct and the court erred by allowing the testimony of IRS Agent James Pogue. Agent Pogue testified that Winters claimed a mileage deduction on his individual return and was also reimbursed by his political campaign for that same mileage. Because this is the first time Winters raises this argument, he must show that the admission of this testimony was plain error. *Sandoval,* 347 F.3d at 631. He cannot do so, however, because Agent Pogue never asserted that this inclusion was false. Rather, he simply noted that as he reviewed Winters's 1998 return, he noticed this fact. This testimony comprises three lines in a 2867-page transcript. It was not plain error for the court to admit a truthful statement that surely had little impact on the jury's verdict.

Winters also claims that the prosecutor engaged in misconduct and the court erred by permitting Agent Pogue's testimony that he could not connect Winters's reported income to that shown on Winters's financial ledgers. This testimony was introduced at Winters's sentencing, however, and so had no ability to influence the jury's verdict, contrary to Winters's claim on appeal. Therefore, this claim is rejected.

### F. Improper Sentence

Winters finally contends that the district court imposed on him an excessive sentence. We review a

district court's interpretation and application of the guidelines *de novo*, *United States v. Samuels*, 521 F.3d 804, 815 (7th Cir. 2008), and once we are assured that the application was correct, we review the sentence imposed for reasonableness under an abuse-of-discretion standard, *United States v. Panaigua-Verdugo*, 537 F.3d 722, 724 (7th Cir. 2008). On appeal, however, a within-guidelines sentence is entitled to a presumption of reasonableness. *United States v. Mendoza*, 576 F.3d 711, 723 (7th Cir. 2009).

In applying the guidelines to Winters's case, the district court first looked to the offense of conviction. Winters was convicted under 26 U.S.C. § 7206(1), and calculations for that offense are determined using U.S.S.G. § 2T1.1. The district court determined, consistent with the jury verdict, that the false deduction claimed by Winters was in the amount of $34,117. Using § 2T1.1(c) Note C, the court then determined that the intended loss was twenty-eight percent (the applicable tax rate) of $34,117, or $9,552.76. The court then used this tax-loss amount to arrive at Winters's base-offense level.

Winters complains that the actual loss to the Treasury was only $450, and therefore, this much smaller amount should have been used to calculate his base-offense level. However, the guidelines explicitly address this point, explaining that intended loss is used to determine base-offense level, not actual loss. U.S.S.G. § 2T1.1(c)(1). The district court therefore properly calculated the guidelines range at fifteen to twenty-one months' imprisonment.

The district court then sentenced Winters to twelve months' imprisonment. Winters nonetheless challenges his below-guidelines sentence, arguing that the court improperly based his sentence on the conspiracy conduct of which he was acquitted. But it is well-settled that acquitted conduct may be considered by the sentencing judge in determining the applicable guidelines range. *United States v. Watts*, 519 U.S. 148, 152-53 (1997) (per curiam). And, in any event, the court made it clear that Winters's sentence was based primarily on his tax fraud. Accordingly, this argument is without merit.

Finally, Winters claims that the court improperly ignored the 18 U.S.C. § 3553(a) factors in imposing the sentence that it did. A sentencing court need not address every factor explicitly. *United States v. Brock*, 433 F.3d 931, 936 (7th Cir. 2006). Rather, it is enough if the court gave the factors meaningful consideration in light of the evidence as a whole. *United States v. Harris*, 490 F.3d 589, 597 (7th Cir. 2007). Here, the court considered the nature and circumstances of Winters's offense, noting that Winters's criminal activity arose out of his effort to be elected to Congress. The court also addressed the need to promote respect for the law, as well as the seriousness of the offense, which was compounded because of Winters's status as an attorney. Because the court properly considered the § 3553(a) factors, this argument, too, is without merit. Winters's sentence is affirmed.

*G. Sufficiency of Evidence*

Hills contends that the evidence against her was insufficient to support her conviction on either count. In examining the sufficiency of the evidence, "[w]e review the evidence at trial in the light most favorable to the government and will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Hampton*, 585 F.3d 1033, 1040 (7th Cir. 2009) (internal quotation marks omitted). This is an onerous burden for an appellant to bear. *See United States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009).

We first examine the sufficiency of the evidence supporting Hill's conviction for conspiracy. To satisfy its burden of showing that Hills engaged in a conspiracy to impede the United States under 18 U.S.C. § 371, the government must prove the existence of three elements beyond a reasonable doubt: "(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United States." *United States v. Cyprian*, 23 F.3d 1189, 1201 (7th Cir. 1994). In satisfying its burden of proof, however, the government may present evidence that is entirely circumstantial. *United States v. Pazos*, 993 F.2d 136, 139 (7th Cir. 1993).

To show the existence of an agreement between Hills and Tylman to defraud the United States, the government presented circumstantial evidence of Hills's

role in selling the Aegis trusts. For example, the government pointed to evidence that Hills made a joint sales pitch with Tylman; signed an Aegis Team Agreement, wherein she agreed to "market and promote membership in Aegis"; and bragged to others, including Agent Priess, about her marketing of the Aegis plan. The government also presented evidence of her financial incentives to sell the trust packages, her knowledge of the trust schemes, her service as the director or creator of several Aegis trusts, her work with Tylman in selling and promoting the Aegis packages, her improper notarization of Aegis documents, her exercise of a power-of-attorney for a WFS customer, her signature authority over the WFS bank account, and her part in changing the name on a flow of income to make it appear to belong to a third party.

Hills's activities are similar to those undertaken by defendants in prior cases that federal courts have found to be sufficient to support convictions from an evidentiary perspective. For example, we found in *United States v. Furkin*, 119 F.3d 1276, 1280 (7th Cir. 1997), that an involved business relationship, among other evidence, was sufficient to sustain a defendant's conspiracy conviction. Similarly, in *United States v. Becker*, 569 F.2d 951, 962 (5th Cir. 1978), the Fifth Circuit found that a defendant's financial interest in the success of a scheme was sufficient circumstantial evidence of participation in the conspiracy. And we found in *United States v. Goulding*, 26 F.3d 656, 663-64 (7th Cir. 1994), that a defendant's participation in arranging the formation of fictitious corporations was sufficient circumstantial evidence of his knowledge of the conspiracy.

Although the evidence that the government presented did not involve direct evidence of Hills's agreement to defraud the United States, at the very least, it was strong circumstantial evidence of her agreement with Tylman to act in a concerted effort to defraud the United States. Assuming for the time being (we will address this below) that Hills had knowledge of the illegality of the trusts and intent to sell them, then her willingness to promote them certainly could show her agreement to conspire against the government.

Next, we examine whether the government presented sufficient evidence to show that Hills engaged in one or more overt acts to further the conspiracy's purpose. We begin by noting that there is much overlap between the evidence tending to show Hill's agreement to join the conspiracy and her acts taken in furtherance thereof. We need not rehash the evidence outlined above. It is enough to note that the evidence presented was sufficient to establish at least circumstantial proof of Hills's actions in furtherance of the conspiracy.

Finally, we turn to whether the government presented sufficient evidence of Hills's intent to commit the offense of defrauding the United States. During the IRS's search of WFS, the agents found an IRS bulletin in Hills's office warning financial advisors to "[s]teer clear of abusive trusts" and informing potential violators of possible criminal prosecution. The IRS agents also found a *Wall Street Journal* article detailing the IRS's recent crackdown on abusive trusts; that article specifically mentioned business trusts and various holding

trusts. Additionally, the agents seized an IRS notice warning financial advisers against the use of abusive trusts and describing the characteristics of those trusts. This description included an explanation of trusts used to hide the owner's identity, multiple trusts used to hide assets, and trusts that were marketed as a means of obtaining tax benefits despite no meaningful change in the taxpayer's control of his assets. And finally, the agents found an advertisement listing Hills as a coordinator for a WFS seminar promoting "reduction of income tax."

The government argued that these documents, in concert, tended to show Hills's intent to defraud the IRS. Viewed in the light most favorable to the government, we cannot say that this evidence was insufficient to permit the jury to draw the conclusion that Hills knew the purpose of the Aegis scheme and intended to defraud the IRS by promoting that scheme.

Because the evidence was sufficient to support the jury's verdict that Hills committed conspiracy to defraud the United States, we reject her argument on this point. We now turn to her argument that there was insufficient evidence to convict her on filing a false tax return.

To prove that Hills willfully filed a false tax return under 26 U.S.C. § 7206(1), the government must demonstrate the existence of four elements beyond a reasonable doubt: (1) the defendant made or caused to be made a federal income tax return that she verified was true; (2) the return was false as to a material matter; (3) the

defendant signed the return willfully and knowing it was false; and (4) the return contained a written declaration that it was made under penalty of perjury. *Oggoian*, 678 F.2d at 673. With regard to criminal tax statutes, the Supreme Court has defined "willfulness" as "a voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 200 (1991). The government is permitted to, and often does, prove willfulness through circumstantial evidence. *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002).

Hills does not challenge the sufficiency of the evidence as it relates to her entire conviction; instead, she challenges only the evidence of her willfulness in filing the false return. The government's evidence of Hills's willfulness consisted primarily of the testimony of her estranged husband, Stephen Hills. Stephen testified that Hills was responsible for managing the couple's finances, and that her responsibilities included having the tax returns prepared. Stephen would provide his wife with all of his relevant paperwork, and she would then compile it and forward it to the couple's accountant.

For the year 2000 (the year of the return on which the conviction was based), the Hillses' return reported their income as $30,376. A single Schedule C was attached to the return. That Schedule C, used to report the taxable value of Stephen's computer business, reported gross receipts of $18,500 and a gross profit of $13,682. It also reported substantial expenses, resulting in an overall loss of $30,798. The IRS determined that the expenses were, in fact, highly inflated; Stephen's business did not

lose $30,798 as reported. Because of these inaccuracies, the Hillses' 2000 income was substantially underreported, showing income of only $194.

Also compounding the error in the return, the Hillses' 2000 return did not include a business Schedule C for Hills, despite the fact that checks totaling $18,258.66 were deposited by WFLA and WFS into Hills's trust account—DJH Asset Management—and her personal bank account. When the government compared the 2000 return to the Hillses' 1999 return, it noticed a discrepancy as the 1999 return had included a Schedule C reporting Hills's receipt of funds from WFLA and WFS.

The government argued that based on Hills's knowledge that the WFLA and WFS income was taxable—as gleaned from her inclusion of these funds on her 1999 return—her failure to report these same funds on her 2000 return proved that her filing a false return was done willfully. Our review of the evidence in the light most favorable to the government leads to our conclusion that a jury could have inferred Hills's intent from this evidence. Stephen's testimony regarding Hills's responsibility for the finances of the family, as well as the differences in her returns for the years 1999 and 2000, and the substantial tax benefit she received from her failure to include a Schedule C with her 2000 return was more than enough circumstantial evidence to establish her willfulness beyond a reasonable doubt. Therefore, her second sufficiency of the evidence argument also fails. We now turn to Hills's prosecutorial misconduct argument.

*H. Prosecutorial Misconduct*

Hills next argues that the prosecution committed misconduct when the prosecutors mentioned the defendants' invocations of their Fifth Amendment right to remain silent during the prosecution's closing argument. Hills did not, however, raise this argument during trial, so we review it only for plain error. *Sandoval*, 347 F.3d at 631. Under our plain-error review, Hills must demonstrate that (1) there was error, (2) it was plain, (3) it affected her substantial rights, and (4) we should exercise our discretion to correct that error because it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732-35 (1993); *United States v. Jaimes-Jaimes*, 406 F.3d 845, 847-49 (7th Cir. 2005). Because we are dealing with a claim of prosecutorial misconduct, Hills must demonstrate that the comments at issue were "obviously" or "clearly" improper. *United States v. Renteria*, 106 F.3d 765, 766-67 (7th Cir. 1997). And because this review is for plain error only, Hills must also show that not only was she deprived of a fair trial, but also that the outcome of that trial probably would have been different absent the prosecution's remarks. *Sandoval*, 347 F.3d at 631.

The Fifth Amendment protects a defendant's right against compelled self-incrimination by permitting a defendant to refuse to testify at her trial. U.S. Const. amend. V. To protect this right, the Supreme Court has determined that the prosecution may not comment on the defendant's refusal to testify before the jury. By putting this stricture in place, the Court has tried to

ensure that the jury will not infer guilt from a defendant's silence. *Griffin v. California*, 380 U.S. 609, 614 (1965). But the rule is not so strict as to bar the prosecution from commenting indirectly on the defendant's exercise of her constitutional rights in all situations. *United States v. Ochoa-Zarate*, 540 F.3d 613, 618 (7th Cir. 2008). In order to determine the propriety of a prosecutor's indirect reference to a defendant's constitutional rights, we must determine whether the remarks, viewed in context, demonstrated the prosecutor's "manifest intent[]" to use the defendant's invocation of her rights as evidence of guilt, or whether the jury would "naturally and necessarily" view the remark as such. *United States v. Willis*, 523 F.3d 762, 773 (7th Cir. 2008).

In this case, the prosecution made two references to the Fifth Amendment during its closing, despite an explicit warning from the district court to refrain from referencing Hills's invocation of her right to remain silent. In particular, in summarizing a recording of Tylman speaking with Agent Priess, the prosecutor stated:

> And you don't really need to worry about that Fifth Amendment protection unless you're worried that you're [d]oing something illegal. They knew perfectly well precisely what they were doing.

(Appellant App. at 97-98.) The prosecutor also stated:

> There are a number of things that are inconsistent with good faith in this case. Hiding things from the IRS, hiding records, lying to the IRS, paying

a little tax to make it look like it's legitimate,
creating entities that really do nothing except to
funnel money through, taking the Fifth Amend-
ment. In this case, they're using the Fifth Amend-
ment not as a shield to protect themselves from
incrimination, but as a sword to prevent the IRS
from getting the information that they are
entitled to.

(*Id.* at 99.)

Hills argues that because neither Tylman nor Winters
invoked their Fifth Amendment rights, any such refer-
ences necessarily referred to her, or at least led the jury
to so conclude. The government counters that the prose-
cution's statements regarding the Fifth Amendment
were not references to Hills's refusal to testify, but were
in fact references to statements that Tylman made to
Agent Priess during the latter's undercover investigation
of WFS.

While we agree with the government that when read
in context, the statements most likely referred to
Tylman's assertions that if investigated, he would simply
"plead[] the Fifth Amendment," (*Id.* at 158), this alone
does not end our inquiry. As already noted, indirect
commentary on a defendant's failure to testify can still
violate that defendant's Fifth Amendment rights, de-
pending on the context in which it is used. *United States
v. Aldaco*, 201 F.3d 979, 987 (7th Cir. 2000).

What ultimately guides our conclusion that these com-
ments were made in error was the fact that the prosecu-
tion cast invocations of the Fifth Amendment in a

negative light, which is surely the very thing that the right against self-incrimination seeks to protect. *See Griffin*, 380 U.S. at 614. As such, we are unable to say that the jury did not "naturally and necessarily" conclude that the prosecution's comments regarding the Fifth Amendment referred to Hills, the only defendant who did not testify in her own behalf. We therefore conclude that it was error for the government to make these references.

We also find that these statements amounted to plain error. First, we note a very simple reason for this conclusion—the district court judge expressly warned the prosecution to refrain from any references to the Fifth Amendment. The prosecution was clearly aware of this restriction, yet made two references to the Fifth Amendment anyway. Second, and most importantly, this error certainly presented more than a "nontrivial possibility" that the references were determinative to the outcome of the case. *United States v. Mannava*, 565 F.3d 412, 414 (7th Cir. 2009). As mentioned, Hills was the only defendant to invoke her Fifth Amendment right. As such, it is entirely possible that the jury thought the prosecution was referring to Hills, and not Tylman. To ensure the viability of the Fifth Amendment by protecting a defendant's right to be free from compelled self-incrimination, we must not allow the prosecution to cast a defendant's invocation of the Fifth Amendment in a negative light, as this serves only to penalize her for exercising that right.

Because we think that the government's references to the Fifth Amendment tip the scales on the side of plain

error, we must next analyze whether that error affected Hills's substantial rights. In determining whether the error affected Hills's substantial rights, we apply the same factors used in a harmless error analysis; however, the burden shifts to the defendant. *See United States v. Olano*, 507 U.S. 725, 734 (1993). We therefore look to

> (1) the intensity and frequency of the references, (2) which party elected to pursue the line of questioning, (3) the use to which the prosecution put the silence, (4) the trial judge's opportunity to grant a motion for a mistrial or to give a curative instruction, and (5) the quantum of other evidence indicative of guilt.

*Fencl v. Abrahamson*, 841 F.2d 760, 763 (7th Cir. 1988); *see also id.* at 766-67.

Hills argues that the lack of direct evidence, coupled with the prosecution's references to the Fifth Amendment, demonstrates that if not for the prosecution's comments, she likely would have been acquitted. In essence, she is claiming that the evidence of her guilt, standing alone, was not enough to convict her and therefore, a conviction would result in a miscarriage of justice. Under these circumstances, we must agree.

The government twice made reference to the Fifth Amendment in the face of explicit warnings to avoid doing so, the judge did not undertake any curative measure to avoid the jury's improper use of those references, and all of the evidence against Hills was circumstantial. Although we note that the prosecution referenced

the Fifth Amendment while purportedly discussing Tylman's actions, the countervailing consideration is that Hills was the only defendant who invoked her Fifth Amendment rights. As such, it seems plausible to us that the jury quite possibly equated this reference to Hills's conduct rather than Tylman's.

Because we have reached the conclusion that Hills met her burden of proving the gravity of the government's error, our only remaining question is whether we should exercise our discretion to correct that error because it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. We think that we must intervene to correct the error in this case.

The government's references to the Fifth Amendment cast insinuations of guilt upon defendants who linger in its protections. Were we to allow these sort of references, the government would have an incentive to undercut a defendant's Fifth Amendment rights in future cases, which is, of course, unfair to defendants. The public would be at a disservice because a fundamental protection ensured by our Constitution would be severely hampered. And the integrity of the judicial system and the respect for the rule of law established by our Constitution would be strained because we would be ignoring the very rationale for the Fifth Amendment's existence. We cannot permit the government's comments to pass without consequence under these circumstances. We must vacate Hills's conviction.

That does not mean, however, that Hills will necessarily walk free. Because Hills's convictions are being vacated

due to the government's improper references to the invocation of the Fifth Amendment right against self-incrimination, there is no double jeopardy bar to her retrial. *United States v. Doyle*, 121 F.3d 1078, 1083-86 (7th Cir. 1997). In *Doyle*, we squarely addressed whether the prosecution's reference to the Fifth Amendment in closing arguments amounts to misconduct that would bar retrial. 121 F.3d at 1086. We explained that our circuit has implicitly rejected the idea that a prosecutor's intent to "prevail at trial by impermissible means" is enough to bar retrial. *Id.* (internal quotation marks omitted). Instead, we noted our position that the only misconduct that bars retrial is "the prosecution's intent to *abort* the trial . . . ." *Id.* (emphasis added). We declined to determine expressly our position, however, because Doyle did not present evidence that the prosecutorial misconduct at issue in his case was designed to secure a victory by resorting to impermissible tactics. *Id.*

We also decline to elaborate on this issue today. Instead, we find that because the government's references to the Fifth Amendment, although improper, likely were intended to refer to Tylman's use of that Amendment, there was no deliberate intent to secure a victory by using impermissible tactics. Because we have already addressed Hills's sufficiency of the evidence claims and found them to be lacking in merit, there are no other obstacles to the government's retrial of Hills. *See id.* at 1083. Her convictions will be vacated and remanded.

*I. Motion to Sever*

Finally, Hills complains that the district court erred in denying her motion to sever her case from that of her co-defendants. Because we are vacating her convictions and remanding her case, we need not address this argument. When Hills is retried, she will stand trial alone. Therefore, any potential error in denying her motion to sever is rendered moot by our decision today.

*J. Release Pending Appeal*

Prior to oral argument in this case, Tylman filed a motion for release pending appeal. That motion was ordered to be taken with the case. Because we affirm his conviction today, we deny Tylman's motion as moot.

### III. CONCLUSION

We AFFIRM Tylman's and Winters's convictions. We VACATE Hills's conviction and REMAND for further proceedings.