

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-17-00509-CR

**EX PARTE** Noah **ESPADA**

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2004CR3638
Honorable Ron Rangel, Judge Presiding

Opinion by:     Patricia O. Alvarez, Justice

Sitting:     Karen Angelini, Justice
             Marialyn Barnard, Justice
             Patricia O. Alvarez, Justice

Delivered and Filed: July 18, 2018

AFFIRMED

Appellant Noah Espada appeals an order denying his application for pre-trial writ of habeas corpus. On appeal, Espada argues the State's attempt to relitigate the question of future dangerousness is a violation of the Double Jeopardy Clause after the punishment phase of his first trial was overturned based on perjured testimony. We affirm the trial court's order.

### FACTUAL AND PROCEDURAL BACKGROUND

This appeal addresses the trial court's denial of Espada's application for pre-trial writ of habeas corpus. During the habeas proceeding, Espada alleged the trial court's grant of a new punishment hearing on his capital murder conviction was barred by double jeopardy.

Because the facts developed in the guilt-innocence and original punishment phase provide necessary background to understand the appellate issues, a brief summary of the original proceedings is set forth below.

## A. Capital Murder Trial—August 2005

### 1. Guilt-Innocence Phase

Noah Espada was charged and found guilty by a Bexar County jury of capital murder of Luke Scott and Sandra Ramos. *Espada v. State*, AP-75,219, 2008 WL 4809235 (Tex. Crim. App. Nov. 5, 2008) (not designated for publication). Espada was working at a nightclub and experienced regular problems with his manager, Luke Scott. *Id*. at *1. Espada was fired on February 14, 2004. *Id*.

Two weeks later, Espada followed Scott to his apartment complex. *Id*. Espada climbed onto the balcony of what he thought was Scott's apartment; however, the apartment was occupied by Sandra Ramos, who did not know Scott. *Id*. Ramos tried for half-an-hour to convince Espada to spare her life, but Espada "didn't want to get caught." *Id*. He "hit Ramos on the back of her head with the butt of his handgun, and then bound her hands and legs with tape." *Id*. The testimony revealed that before Espada left the apartment, Ramos regained consciousness. *Id*. Espada "placed a plastic trash bag over her head and tightened it. *Id*. [He] then took Ramos's truck key and left her apartment while she was still alive" and struggling to breathe. *Id*.

A few days later, Espada returned to the apartment complex, entered Scott's apartment through the balcony, and waited for Scott to return home. *Id*. When Scott entered the apartment, Espada shot him three times with a .45 revolver. *Id*. The third shot was to the back of Scott's head as he tried to flee. *Id*. Espada "took Scott's car keys, watch, hand-held computer, and wallet, and then drove away in Scott's car." *Id*.

The jury returned a guilty verdict for the capital murder of Luke Scott and Sandra Ramos.

*2.     Punishment Phase*

For purposes of this opinion, we focus on the punishment testimony of two witnesses: (1) the Bexar County jail guard, Christopher Nieto, whose testimony the trial court described as, "at the very least, misleading;" and (2) the State's expert forensic psychiatrist, Dr. Richard Coons.

     a.     <u>Christopher Nieto</u>

Christopher Nieto, a Bexar County jail guard during the time Espada was in custody and awaiting trial, was called by the State regarding several illegal acts Espada committed while in Bexar County custody.  At the time of trial, however, Nieto no longer worked for the Bexar County Sheriff's Office.  He explained that he

> . . . lent my vehicle out to my brother-in-law [and he] was doing some bad things he wasn't supposed to be doing.  He brought my vehicle back and he left a joint in there.  I went to work.  They had a random search of vehicles.  My vehicle came up dirty.  After that, they called me out.  I had to take a urine test and I had to take a polygraph test.  Everything came back negative.
>
> The fact of the matter was that they found half a joint in there.  And after that, I resigned.

Nieto reiterated that he never failed a urinalysis test, his brother signed an affidavit the joint was his, and that Nieto resigned to avoid disciplinary actions.

Nieto testified that on April 27, 2004, and the following day, April 28, 2004, during inspections of Espada's cell, Nieto located contraband—Xanax pills—in Espada's bunk.  Nieto also testified that on April 28, 2004, he witnessed Espada exit his cell, and instead of turning left to walk to the stairs, Espada "immediately turned to his right and basically attacked [another inmate] with a closed fist; started throwing punches at his upper body and torso."  Nieto described Espada as the aggressor, and that the other inmate "had to protect himself."

Lastly, Nieto testified that on one occasion the intercom in Espada's cell was inadvertently left on when Espada's cellmate asked for a Tylenol, and Nieto overheard Espada bragging to his cellmate about the killing of one of his victims and that Espada left her gasping for air.

        b.        <u>Dr. Richard Coons</u>

The State also called expert Dr. Richard Coons, a forensic psychiatrist, to testify regarding future dangerousness. Dr. Coons testified that Espada would probably commit criminal acts of violence that would constitute a continuing threat to society. He further identified certain evidence as particularly important in his determination. First, Dr. Coons testified, "There's fighting in the jail with another inmate. And it's a bad sign that someone would be violent during—awaiting trial for capital murder knowing there's an issue of future dangerousness in the offing." Dr. Coons also noted that Espada's murder was planned, he followed it, and when an innocent individual was in his way, he killed her for the sole purpose of covering his tracks. "And apparently . . . bragging [about it]." Dr. Coons grouped these behaviors as a strong indication of Espada's "lack of personal control," a poor conscience, and no remorse.

        c.        <u>State's Closing Argument</u>

During the State's closing, the prosecutor argued the evidence supported beyond a reasonable doubt that Espada represented a future danger. Espada was in jail, facing the death penalty, "[h]e knows he's got to keep his nose clean. And 40 days after he's in jail, he attacks another inmate." The prosecutor continued, "That, ladies and gentlemen, is an act of violence. [Espada's] already answered your questioned beyond a reasonable doubt; not only by what he did to [the victims], but what he's done when he's been locked up."

The jury answered "yes" to the future dangerous special issue and "no" to the mitigating circumstances special issue. Based on the jury's findings, the trial court sentenced Espada to death.

The Court of Criminal Appeals affirmed the conviction. *Espada*, 2008 WL 4809235, at *19.

**ESPADA GRANTED NEW PUNISHMENT HEARING**

Espada filed an application for post-conviction writ of habeas corpus in July of 2007. On June 6, 2012, Espada was granted a hearing on his application.

**A.**     **Application for Post-Conviction Writ of Habeas Corpus:**
**Transcripts from December 13, 2012 and January 16, 2013**

The hearing was held on November 12, 2012, December 13, 2012, and January 16, 2013. The relevant testimony focused on whether (1) the State suppressed exculpatory and impeachment evidence in violation of Espada's right to due process under *Brady*; and (2) the State knowingly presented perjured testimony. Because Espada's argument focuses on the State's duty to learn the reason for Nieto's resignation and the actual facts behind the fight in which Espada was involved, the drugs in Espada's cell, and Espada's alleged confession, we provide a more detailed summary of the testimony in question.

*1.     Evidence Presented at Habeas Hearing*

a.     <u>Christopher Nieto</u>

After failing to appear at the first setting, Nieto did ultimately appear pursuant to subpoena. The trial court's findings described that after confirming everything he testified to at the trial was true and correct, "Nieto's credibility then began to unravel." Nieto acknowledged he forgot about the bong and the several plastic baggies in his vehicle, one with a small amount of residue. Nieto denied knowledge of any investigation of him for trafficking drugs into the jail; however, he admitted that on the day he resigned, an inmate accused him of trafficking cocaine in the jail. He also understood the officers were looking for something during the search of his vehicle, "but he claimed '[t]hey didn't tell me what.'" He clarified that although his testimony appears to suggest

he passed the urine and polygraph tests, what he meant was that he was waiting to be called for the tests so that everything would come out negative. But Nieto acknowledged that neither test was ever scheduled or administered.

Nieto was also presented with an order of suspension he received based on an incident on March 28, 2004, wherein Nieto made aggressive and threatening physical contact with Espada, grabbed him and spoke to him in an antagonistic and arrogant manner, ultimately issuing the "veiled threat" about being "the bad ass who killed two people." Nieto denied the incident occurred and claimed the suspension was the result of a dispute between Nieto and another officer. Nieto felt the other officer was too lenient with the inmates and the other officer felt Nieto was "too much of an ass with the inmates." Nieto admitted signing off on the report, but asserted his suspension was for entering the other officer's unit without authorization, not for anything said to Espada. The Bexar County Sheriff's Officer chief who conducted the hearing testified that Nieto admitted everything in the suspension order and did not "deny any of the allegations." Nieto also denied setting up the fight between Espada and the other inmate. As proof of such, Nieto testified at great length regarding who opens the doors on any given day and which inmates are released during a given hour.

Nieto acknowledged being convicted of a state jail felony, theft over $1,500, on August 23, 2010. Nieto testified he did not know his brother-in-law's contact information and refused to provide his sister's contact information. When asked to produce his cellphone, Nieto claimed the cellphone was at home. Nieto's counsel informed the trial court that the cellphone was in the custody of Nieto's girlfriend, who was standing outside the courtroom. Nieto's testimony was halted when he asked to stop questioning and to speak to his counsel.

b. Other Officers and Inmates

The K-9 officer testified that she was instructed to walk around Nieto's vehicle with her K-9. The dog alerted and ultimately located a plastic baggy with marijuana, a bong, and other plastic bags, but not a joint. Nieto's Bexar County Probation Officer testified that Elite Counseling's assessment of Nieto read, "Cannabis dependent, cocaine abuse, negative learned behaviors, dishonesty, manipulativeness, denial of treatment needs, underemployment, lack of impulse control."

Espada's cellmate was also called during the habeas hearing. His cellmate testified that he never asked for Tylenol and that Nieto planted the drugs in their cell. Regarding the fight, the cellmate testified that he observed the other inmate, with Espada in a choke hold, telling Espada, "that's what you get for killing a girl." The inmate further alleged that Nieto rushed to the stairs, but did not initiate the alarm which would have warned the other guards. As Nieto approached the stairs, he yelled at Espada and the other inmate to get on the floor and both inmates complied. Nieto then ran down the stairs, closing food tray doors so that "no one could look through them and witness what was happening." As Nieto approached Espada, the cellmate testified that "Nieto jumped in the air and came down with his knee on [Espada's] back. [Espada] was not resisting at that time." Another inmate echoed Espada's cellmate's version of the fight. He also described Espada as weighing no more than 120 pounds, while the other inmate weighed about 230 pounds. This inmate tried to warn Espada when he heard Nieto joking and telling people to "[g]et ready for the show."

Finally, the other inmate involved in the fight testified that Nieto asked him to fight Espada. Nieto arranged for both inmates to have the same recreation time and then told him to "make it look good," and "just don't go too overboard with him," and "'smash on him, you know." When Nieto saw Espada leaving his cell, Nieto would say, "dead man walking," and told him that he was

going to "f—k . . . over" Espada at trial. At the end of the fight, Espada's blood was everywhere; the inmate tried to throw Espada over the railing, but Nieto stopped him and told him "just get out of the way." He confirmed that Nieto jumped on Espada's back and neck and that Espada did not resist. In exchange for beating up Espada, the inmate claimed he received extras including Xanax pills, extra day room time, and phone privileges.

A Bexar County Sheriff's deputy testified that the day after the fight, he was relocating Espada and a calm Espada told him, "he had to get [the other inmate] first because [the other inmate had] been talking shit about him and saying that he's a little bitch." The jail guard who opened the cell doors on the day in question testified that he saw the two inmates exit their cells, come together, and begin to fight. According to the guard, Espada was the aggressor and the other inmate hit back. He denied the presence of significant blood or that the other inmate attempted to throw Espada over the rail.

### c. State Prosecutor

The prosecutor testified that he was an attorney with the Bexar County District Attorney's Office for twenty-two years and had tried fifteen capital murder cases, approximately half of which were death penalty cases. When the decision is made to seek the death penalty, a prosecutor must seek out other evidence that supports or mitigates against the death penalty. "One of the places a prosecutor looks for evidence of future dangerousness is the jail." The jail records generally provide evidence of "any incident reports or failure to follow rules, or contraband violations, or getting in fights, or fighting with jailers, that might help to prove future dangerousness."

He remembered seeing the report about the fight between Espada and the other inmate and the quote from Espada, "It's all true." The prosecutor testified that he never saw anything before trial that conflicted with Espada's acknowledgement of his involvement and taking credit for the fight and the Xanax in his cell. He also never saw anything to suggest that Nieto was lying about

overhearing Espada bragging, finding the Xanax in Espada's cell, or the fight. The prosecutor further explained that because Nieto was no longer with the Bexar County Sheriff's Office, he was more difficult to locate and he was not able to speak to him prior to jury selection. In fact, the prosecutor met Nieto just before the punishment phase began; he spoke to him in a conference room for approximately fifteen minutes, immediately before Nieto was called to testify.

During their meeting, Nieto acknowledged to the prosecutor that his brother-in-law left a marijuana joint in Nieto's vehicle and the joint was found during a random search of the employee vehicles. Nieto claimed he was going to be reprimanded or punished and decided to resign to avoid the punishment. When asked whether "it seem[ed] odd to you that [Nieto] resigned after everything came back negative?" The prosecutor explained that the first time he spoke to Nieto was on the day of his testimony, shortly before taking the stand. In fact, Nieto's testimony that he passed the polygraph and urine tests, was the first time the prosecutor was aware the tests were administered to Nieto. The jail guard's resignation did not strike the prosecutor as odd because "[i]t's not the most prestigious job in the world." Nothing about their conversation "set-off red flags" and it is unfortunately not uncommon for former jail guards to resign because of potential marijuana use. Nieto's version of events still matched the reports in the State's possession, and each of the reports appeared to be acknowledged as true by Espada. "Nieto seemed truthful and perfectly credible to him at the time."

The prosecutor also testified that he did not know Nieto was under FBI investigation or the White Collar Crime division of the Bexar County District Attorney's Office. The defense asked Nieto about the FBI investigation, Nieto denied it, and the defense did not pursue it any further. The prosecutor further explained that, as part of the trial division, he did not have access to or knowledge of cases being investigated by or presented to the grand jury by the White Collar Crime division. He never talked to anyone or discussed Nieto with the White Collar Crime division. The

prosecutor also testified that he never requested or obtained Nieto's personnel file from the Sheriff's Office or internal affairs, but is not his practice to do so.

The prosecutor further testified that he had a "really good working relationship" with both defense counsel; they both knew the case and were focused on punishment. The prosecutor acknowledged never speaking to either inmate or knowing that the inmate involved in the fight was ready to testify that he fought Espada at Nieto's request. Espada's cellmate also testified that he never asked Nieto for Tylenol, which is how Nieto claimed to overhear Espada bragging about the killing.

The prosecutor was presented with a copy of Nieto's internal affairs file and his personnel file, which the prosecutor had never obtained from the Sheriff's Office. Contained within the personnel file was the notice of proposed suspension dated April 14, 2004, over eleven months before jury selection in Espada's capital murder case. There was further testimony that Nieto was suspended for "walking up to Noah Espada, grabbing him by the shirt and saying, You're the badass who killed two people, you better hope that I don't work here on Sunday—on Saturday." The prosecutor denied knowing that at the time of trial Nieto had been investigated at a grand jury proceeding by the White Collar division of the Bexar County District Attorney's Office.

During cross-examination, the prosecutor explained that he always requested that his investigator check the jail logs, incident reports, or anything similar from the jailers to determine whether there was any contraband or fights. He reiterated that neither before or during the trial did he have any information, formal or informal, that there was any reason to call the Nieto jail logs into question. He further testified that the fact that Espada's cellmate might testify favorably to Espada was also not unusual and did not give him reason to suspect Nieto's testimony. Although there were other incident reports made at the jail, the prosecutor explained that he generally only brings in the "main guy" if possible. In this case, that was Nieto.

## 2. *Trial Court's Findings*

On October 8, 2014, the trial court filed a 132-page Findings of Fact, Conclusions of Law, Recommendations, and Order to the Texas Court of Criminal Appeals. The trial court made several findings, including:

- "the State did not withhold exculpatory evidence or knowingly present false testimony,"
- "trial counsel was not ineffective for failing to discover the information concerning Nieto before trial,"
- "Nieto presented false testimony,"
- Nieto's "false testimony was 'more likely than not the tipping point' on the issue of future dangerousness," and
- Espada "established by a preponderance of the evidence that Nieto's false testimony was material to the jury's finding of future dangerousness."

*See Ex parte Espada*, No. WR-79,108-01, 2015 WL 4040778, at *2 (Tex. Crim. App. July 1, 2015) (per curiam) (not designated for publication). Based on its findings, the trial court recommended the Texas Court of Criminal Appeals grant Espada a new punishment hearing. *Id*. The *Espada* Court granted relief with respect to the allegations of material false testimony and remanded the cause for a new punishment hearing. *Id*.

Prior to jury selection for the new punishment hearing, Espada filed a pre-trial writ of habeas corpus alleging the State's failure to disclose exculpatory evidence about Nieto was a violation of Espada's right to due process.

## B. Pre-Trial Writ of Habeas Corpus

Espada filed his pre-trial writ on May 5, 2017. At the hearing, held on June 7, 2017, defense counsel argued it was "unfair" for Espada to have to defend against the State's seeking of the death penalty for several reasons: (1) the impossibility of explaining to the jury where Espada has been for the last twelve or thirteen years; (2) the State cannot use Espada's being locked up on death row as reason for Espada's lack of violence during last twelve or thirteen years; (3) State

should have known "there's something fishy" about Nieto; and (4) the State bore the burden to obtain the information about Nieto and provide it to the defense and failed to do so. Espada argued the State thus could not "seek death in this case under the grounds of double jeopardy and estoppel."

The trial court denied the writ and this appeal ensued.

## DOUBLE JEOPARDY

### A. Standard of Review

"An applicant seeking habeas corpus relief must prove his claim by a preponderance of the evidence." *Ex parte Cruz*, 350 S.W.3d 166, 167 (Tex. App.—San Antonio 2011, orig. proceeding). When reviewing a trial court's ruling on an application for habeas corpus, an appellate court reviews the evidence in the light most favorable to the trial court's ruling, and upholds the ruling absent an abuse of discretion. *See id.*; *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006).

### B. Arguments of the Parties

Espada contends that regardless of whether the prosecutor knew about the allegations, the evidence was in the State's possession, the evidence was favorable to Espada and material to punishment—a clear *Brady* violation. The evidence was in the jailer's personnel file at the Sheriff's Office, in an internal affairs file at the Sheriff's Office, and the Bexar County District Attorney's White Collar Crime Unit had presented evidence to the grand jury concerning the jail guard in question. Because the testimony "was more likely than not *the tipping point* that persuaded the jury to find that [Espada] was a future danger," Espada argues the prosecutor's misconduct resulted in Espada's exposure to double jeopardy on the finding of future dangerousness. Espada argues the State is barred from retrying the issue of future dangerousness and is therefore barred from resentencing Espada to a death sentence.

The State counters that constitutional proscription against double jeopardy provides three types of protection against duplicative prosecutions: 1) protection against a second prosecution for the same offense after an acquittal; 2) protection against a second prosecution for the same offense following a conviction; and 3) protection against multiple punishments for the same offense. *See Speights v. State*, 464 S.W.3d 719, 722 (Tex. Crim. App. 2015). Espada's punishment phase retrial does not violate any of these protections. He was not acquitted of the offense, he is not being prosecuted again for the same offense, and he is not facing multiple punishments for that offense. Rather, Espada is facing a new punishment as a result of relief granted in a post-conviction habeas proceeding. The Court of Criminal Appeals set aside the prior sentence and specifically remanded the case back to the trial court for "a new punishment hearing."

## C.     Double Jeopardy Post-Conviction

Generally, a defendant in a criminal case may not be put in jeopardy by the State twice for the same offense. U.S. CONST. amends. V, XIV; TEX. CONST. art. I, § 14; *see also Pierson v. State*, 426 S.W.3d 763, 769 (Tex. Crim. App. 2014). Double jeopardy generally "does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." *Lockhart v. Nelson*, 488 U.S. 33, 38 (1988); *accord Ex parte Davis*, 957 S.W.2d 9, 12 (Tex. Crim. App. 1997). "[I]f a conviction is reversed because the evidence is legally insufficient to convict, retrial is barred because, for double jeopardy purposes, this is equivalent to a judgment of acquittal." *Ex parte Davis*, 957 S.W.2d at 12 (citing *United States v. Doyle*, 121 F.3d 1078, 1083 (7th Cir. 1997)).

In *Agurs*, the United States Supreme Court further defined the scope of *Brady* violations. *United States v. Agurs*, 427 U.S. 97, 103 (1976). The Court discussed three types of violations that fell within the scope of *Brady*: (1) perjured testimony; (2) specific requests; and (3) general

- 13 -

requests. *Id*. at 103–07. First, the Court described undisclosed exculpatory evidence demonstrating the prosecution's case included perjured testimony, and the prosecution knew or should have known of the perjury. *Id*. at 103. This type of violation, the Court stated, is fundamentally unfair and violates due process. *Id*. Thus, a conviction based on knowingly perjured testimony must be set aside if there is any reasonable likelihood the testimony could have affected the judgment of the jury. *Id*. Indeed, this type of violation "involve[s] a corruption of the truth-seeking function of the trial process." *Id*. at 104.

Many Texas courts follow *Agurs* when a *Brady* violation results from evidence disclosed after trial that "demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Id*. at 103. A person commits perjury if "he makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath." TEX. PENAL CODE ANN. § 37.02 (West 2016).

Because Nieto's testimony was clearly a false statement, intended to deceive the State and the jurors, we conclude this case falls within the purview of *Agurs*. *See Agurs*, 427 U.S. at 103. As the State argues, Espada proved the State relied on perjured testimony. After the habeas hearing, the trial court determined the testimony was relevant, material, and admissible and granted a new trial on punishment. If the trial proceeds to a verdict, the defendant is convicted, and that conviction is later set aside due to a procedural error—and not for lack of evidence—double jeopardy does not bar a retrial. *Compare Ex parte Davis*, 957 S.W.2d 9, 15 (Tex. Crim. App. 1997) (holding that jeopardy does not apply to bar a retrial where defendant's conviction is reversed on appeal due to prosecutorial misconduct); *Ex parte Legrand*, 291 S.W.3d 31, 40–41 (Tex. App.—Houston [14th Dist.] 2009, pet ref'd) (holding that jeopardy does not apply to bar retrial where defendant's motion for new trial is granted due to prosecutorial misconduct) *with*

*Speights*, 464 S.W.3d at 722 (providing double jeopardy protects against second prosecution for the same offense after an acquittal or following conviction or multiple punishment for same offense).

Espada was not acquitted of capital murder. *See Espada*, 2008 WL 408235. The Court of Criminal Appeal found the jury relied on perjured testimony in the punishment phase and granted a new trial as to punishment—that is not the same as an acquittal. *See Ex parte Mitchell*, 977 S.W.2d 575, 578 (Tex. Crim. App. 1997) (concluding reversal not based on sufficiency provides "continuing jeopardy"). Espada is not being punished for the same offense, nor facing multiple punishments for that offense. *Cf. Speights*, 464 S.W.3d at 722. Instead, Espada is facing a new punishment hearing at which the State must present evidence to support the sentence it seeks. *See Davis*, 957 S.W.2d at 15; *Legrand*, 291 S.W.3d at 40–41.

When, as in this case, the matter is tried to a conclusion, and the jury is provided an opportunity to render a verdict, the concerns of a prosecutor goading a mistrial are not present. *Cf. Oregon v. Kennedy*, 456 U.S. 667, 672 (1982) (barring retrial where defendant demonstrated prosecutor's misconduct "intended to 'goad' the defendant into moving for a mistrial[.]"); *accord Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007). The distinction is clear. The *Kennedy* concern deprives a defendant of the opportunity for a jury to find the defendant not guilty. It takes the case away from the jury before the jury can find in favor of a defendant, thus the temptation for a prosecutor to potentially act less scrupulously. It is the *Kennedy* scenario when the prosecutor's *Brady* violation results in a mistrial that triggers double jeopardy protections. *See Ex parte Lewis*, 219 S.W.3d at 358 (concluding defendant's valued right to complete his trial before the first jury would be a "hollow shell" if retrial were permitted after prosecution intentionally precipitated a mistrial); *see also Kennedy,* 456 U.S. at 673.

## CONCLUSION

Here, Espada was not deprived of the right to one jury; Espada's "first jury" completed the trial to the end. Because the case was completed to verdict, whether Christopher Nieto's personnel file constituted *Brady* material, and whether the State was obligated to provide such material to Espada's defense counsel, does not affect jeopardy in this case. Because the information came to light after Espada's conviction, the information never raised the issue of a mistrial. As explained above, the scenario about which Espada complains is when a mistrial is goaded by the prosecutor, then *Brady* does *in fact* trigger double jeopardy to bar a retrial. *See Ex parte Davis*, 957 S.W.2d at 15.

After proving the State relied on perjured testimony, Espada successfully prevailed in having his first conviction set aside. Based on these facts, however, double jeopardy does not prevent the government from retrying Espada. *See id.* at 14 ("It has long been the law that where a defendant's due process rights have been violated to the extent that he has been denied a fair trial, the proper remedy is reversal of his conviction and remand of the cause to the trial court for further proceedings."). The trial court therefore properly denied relief and we overrule Espada's sole issue on appeal.

Patricia O. Alvarez, Justice

PUBLISH